*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0365p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee,*

v.

GARY MICHAEL BROCK (05-6621); JERRY GILES
BROCK (05-6623); and DARRIN T. WEBB
(05-6622/6645),

> *Defendants-Appellants.*

Nos. 05-6621/6622/6623/6645

---

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
Nos. 04-00186; 04-00188—R. Allan Edgar, District Judge.

Argued: January 31, 2007

Decided and Filed: September 6, 2007

Before: GILMAN and SUTTON, Circuit Judges; TARNOW, District Judge.[*]

---

## COUNSEL

**ARGUED:** John P. Konvalinka, GRANT, KONVALINKA & HARRISON, Chattanooga, Tennessee, Martin J. Levitt, LEVITT & LEVITT, Chattanooga, Tennessee, Fielding H. Atchley, Jr., DIETZEN & ATCHLEY, Chattanooga, Tennessee, for Appellants. Gary Humble, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** John P. Konvalinka, Matthew D. Brownfield, GRANT, KONVALINKA & HARRISON, Chattanooga, Tennessee, Martin J. Levitt, LEVITT & LEVITT, Chattanooga, Tennessee, Fielding H. Atchley, Jr., DIETZEN & ATCHLEY, Chattanooga, Tennessee, for Appellants. Gary Humble, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

---

## OPINION

---

SUTTON, Circuit Judge. May the payor of a bribe to a state official conspire with that official to extort property from himself in violation of the Hobbs Act? We hold that he cannot, and

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

we thus reverse the convictions of Michael and Jerry Brock.  Darrin Webb's unrelated challenges to his conviction and sentence, by contrast, do not have merit, and we thus affirm both of them.

I.

Michael Brock and Darrin Webb are "best friends" with a long history.  The two once operated video poker machines together in Chattanooga, Tennessee.  Michael Brock eventually left that business to open Brock Bonding, a bail bond company, which he now runs with his brother Jerry.  Webb remained in the video poker business after Michael Brock's departure, and over the years he also developed a reputation as someone who had a way with fire.  *See* JA 139, 642–43 (Webb admitting that he had "burned some [buildings] down in [his] past. . . .  People pull your machines out, and . . . [y]ou know, bad things happen.").

In December 1999, while Webb was working on a poker machine at a local bar, the bar's employees—apparently interested in burning down a rival bar—asked him how to start a chemical fire.  Webb explained how to create a "delayed reaction" fire, using Score hair gel, that would leave "no trace."  JA 348–49.  Despite Webb's assistance, the planned arson never took place.

In May 2001, one of Brock Bonding's clients "skipped town," which as a business matter meant that Brock Bonding would have to pay the bond.  To avoid having to make this payment, Jerry Brock approached Scott Simcox, a friend and the supervisory clerk for the criminal division of the county courthouse, who agreed to "make [the problem] go away" by removing the scheduled forfeiture hearing from the court's calendar.  JA 362.  (Without the prompt of a hearing, as Jerry Brock well knew, the court would never order the Brocks to forfeit the bonds entered on behalf of their clients.)  Two days later, Jerry Brock called Simcox and told him to "swing by the office" when he was heading home.  There, Jerry Brock gave Simcox a "$100 bill" to thank him for "helping . . . out."  *Id.*

For the next two-and-a-half years, Simcox fixed the court date of the bond forfeiture hearing whenever a client of Brock Bonding fled the county—which happened 24 times.  Each time, Jerry Brock paid Simcox 10% of the face value of the bond that Brock Bonding would have forfeited.

On September 6, 2003, Webb, who had learned about Simcox from Michael Brock, paid Simcox $1,000 to erase several of his girlfriend's traffic citations.

In early December, officers from the Federal Bureau of Investigation approached Simcox.  When they told him that they "knew what [he] was doing," Simcox agreed to cooperate with them by recording his conversations with the Brocks.  JA 366.

On December 16, Jerry Brock contacted Simcox about fixing another case.  Two days later, Simcox wore a wire to a meeting with him, where Jerry gave Simcox $200 for dealing with two prior cases and where they discussed another case involving a $7,000 bond that might need to be fixed soon.

On February 6, 2004, Simcox wore a wire to another meeting, where Jerry Brock gave Simcox "10[] $100 bills" for "taking care of prior cases."  JA 386–87.  Jerry asked Simcox to fix the case they had discussed back in December and one other case.  Jerry also asked Simcox to help his brother get out of a traffic citation.

On March 8, Simcox met with Jerry Brock at the office of Brock Bonding to discuss additional work that Jerry needed to have done.  Michael Brock stepped in and asked if Simcox had taken care of his traffic citation.  On March 12, Jerry Brock paid Simcox another $400 for his work.

Even though the Brocks and Webb continued to pay him for his efforts, Simcox stopped fixing cases after the FBI confronted him. In mid-March, Jerry and Michael Brock noticed that one of the supposedly fixed cases kept "popping back up" on the list of upcoming hearings. On March 24, the Brocks shared their concerns with Simcox. JA 405–06. Jerry Brock reiterated his concerns to Simcox on April 13 and gave him a list of cases on the calendar that should have been fixed. And on April 20, Michael Brock again called Simcox to discuss his traffic citation.

On December 15, the government filed parallel indictments against Webb and the Brocks alleging that they had conspired to bribe a public official (Simcox) in violation of the Hobbs Act. 18 U.S.C. § 1951. Webb's indictment also charged him with illegally distributing information about an incendiary device to the employees of a local bar, *see* 18 U.S.C. § 842(p)(2), and the Brocks' indictment charged them with four counts of mail fraud, *see* 18 U.S.C. § 1341.

Michael Brock and Webb both retained Fred Hanzelik as counsel. (Jerry Brock maintained separate counsel.) The government wrote Hanzelik a letter seeking to negotiate a plea agreement for Michael Brock, for Webb or for a third client of Hanzelik's, Dean DiFilippo. The letter, among other things, asked if Webb would consider testifying against Michael Brock, asked if Webb would consider testifying against DiFilippo or vice versa and noted that Hanzelik's continued representation of all three individuals might violate the Tennessee Rules of Professional Conduct.

The government filed a motion asking the district court to determine whether Hanzelik's representation of Michael Brock, Webb and DiFilippo was appropriate, after which the district court held an evidentiary hearing. After hearing the testimony of two government witnesses, after observing that the government had filed an intervening indictment alleging that Webb and the Brocks had conspired together to bribe Simcox and after questioning Hanzelik extensively, the district court gave Hanzelik four days to respond to the government's contentions.

Following the hearing, Hanzelik stopped representing DiFilippo. And on February 14, Michael Brock and Webb filed nearly identical affidavits, each stating that he was "unaware of any conflict of interest," that he "heard all of the things discussed in Court . . . and [did] not feel that any of those things presented a conflict," but that "[i]f the Court believes there is a conflict of interest in this case," "actual or potential," each "affirmatively waive[d] [the] conflict." JA 183, 186.

On February 15, the district court disqualified Hanzelik from representing both Webb and Michael Brock because the situation was "rife with potential conflicts of interest." JA 195. The court noted that it may "be in the best interest of one of these clients to plead guilty and testify against the other" and that, should they both be found guilty, Hanzelik "may be in a position of contending that one or the other of his clients should receive a mitigating role . . . and thus a lesser sentence than the other." JA 196. And because the waivers did not acknowledge these potential conflicts, the district court found that Brock and Webb did not "clearly comprehend the risks here" and thus did not "know what they [were] waiving." JA 197.

A federal jury convicted Webb of illegally distributing information relating to a destructive device, and he later pleaded guilty to violating the Hobbs Act. After hearing extensive testimony about Webb's "considerable additional criminal activity other than . . . what he was convicted of in this case," JA 659, the district court decided that a sentence within the advisory guidelines range of 27–33 months was not "enough to deter criminal conduct," JA 660, and imposed a 48-month sentence.

Although the court dismissed the mail-fraud charges against the Brocks, the jury convicted the two of conspiring with Simcox to extort money in violation of the Hobbs Act. After considering the advisory guidelines range of 21–27 months along with the other § 3553(a) factors, the court sentenced each of the Brocks to a 21-month prison term.

II.

Mike and Jerry Brock contend that the Hobbs Act does not permit them to be convicted of conspiring to extort their own property. We agree and accordingly reverse their convictions and sentences.

The relevant provisions of the Hobbs Act say:

Interference with commerce by threats or violence

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section–
. . .

> (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951.

The question is whether extortion, or a conspiracy to commit extortion, extends to the Brocks' scheme, which essentially amounted to the bribing of a state-court clerk to prevent bail bonds from being collected when the Brocks' criminal-defendant clients skipped town. All agree that the Brocks did not commit a substantive act of extortion. They did not "obtain[] . . . property from another" person. *Id.* § 1951(b)(2). And they are not public officials and thus could not have obtained any property "under color of official right," *id.*, and did not otherwise use "actual or threatened force, violence, or fear" in the course of this bribery scheme, *id.*; *see Evans v. United States*, 504 U.S. 255, 265 (1992).

That leaves the possibility of a conspiracy to commit extortion. The Hobbs Act prohibits "conspir[ing]" to "affect[] commerce . . . by . . . extortion," 18 U.S.C. § 1951(a), and it defines extortion involving a public official as the "obtaining of property from another, with his consent . . . under color of official right," *id.* § 1951(b)(2). To be covered by the statute, the alleged conspirators—the Brocks and Simcox (the court clerk)—must have formed an agreement to obtain "property from *another*," which is to say, formed an agreement to obtain property from someone outside the conspiracy. Yet that did not happen. These three people did not agree, and could not have agreed, to obtain property from "another" when no other person was involved—when the property, so far as the record shows, went from one coconspirator (one of the Brocks) to another (Simcox). We see no reason to ignore the "property from another" requirement and ample reason to give it content. *See Jones v. United States*, 529 U.S. 848, 857 (2000) ("Judges should hesitate to treat statutory terms in any setting as surplusage, and resistance should be heightened when the words describe an element of a criminal offense.") (internal quotation marks, brackets and ellipses omitted).

In addition to requiring the conspirators to agree to obtain property from another, the statute requires the conspirators to obtain that property with the other's *consent*. How do (or why would) people conspire to obtain their own consent? And how could it be said that the Brocks conspired with Simcox to obtain their consent to give, say, "10 $100 bills" to him, JA 387, money which came from their own pockets or at most from their own company, Brock Bonding? The context in which

the consent requirement appears confirms that it must be taken seriously.  The Hobbs Act prohibits not only extortion but robbery as well; what separates the two is the payor's consent.  *Compare* 18 U.S.C. § 1951(b)(1) (defining robbery as "taking . . . property from . . . another, against his will"), *with id.* § 1951(b)(2) (defining extortion as "obtaining . . . property from another, with his consent"). Failure to respect the consent requirement blurs the line between robbery and extortion.

These textual shortcomings underscore another concern.  The Hobbs Act is meant to prohibit public officials from obtaining property from others by extortion.  Yet sweeping the Brocks within its coverage through a conspiracy theory effectively transforms the Act into a prohibition on paying bribes to public officials.  While the definition of extortion "under color of official right" correctly extends to public officials who *accept* a bribe when there is a quid pro quo for the payment, *see Evans*, 504 U.S. at 269; *United States v. Harding*, 563 F.2d 299, 305 (6th Cir. 1977), neither the Supreme Court nor our court has construed the statute to cover private individuals who *offer* a bribe to public officials.  Congress knows how to prohibit the giving or offering of bribes directly.  *See, e.g.*, 18 U.S.C. § 201(b)(1) (making it an offense to "give[], offer[] or promise[] anything of value to any [federal] official"); *id.* § 210 (making it an offense to "pay[] or offer[] or promise[] any money or thing of value, to any person, firm, or corporation in consideration of the use or promise to use any influence to procure any appointive office or place under the United States for any person"); *id.* § 212(a) (making it an offense for "an officer, director, or employee of a financial institution" to loan or give money to a federal examiner "who examines or has authority to examine such . . . institution"); *id.* § 226(a)(1) (making it an offense to compromise the security of "any secure or restricted area or seaport" by "corruptly giv[ing], offer[ing], or promis[ing] anything of value to any public or private person").  Having opted not to punish the giving of bribes directly, Congress should not be treated as having prohibited them through the sleight of indictment of an extortion conspiracy.  Indeed, under the government's theory of prosecution, it is difficult to see what independent role these other federal statutes play.  This is, in short, the seventh degree of separation.

Two other interpretive principles undermine this prosecution.  Although we think it clear that the language of the Hobbs Act does not prohibit bribery either directly or indirectly through the contortion of an extortion conspiracy, one must acknowledge at a minimum that the text of the statute does not unambiguously support the government's theory of prosecution—because, as we have shown, the law says that the conspiracy must extort "property from another" and do so "with his consent," neither of which applies naturally to the conspirators' own property or to their own consent.  "When there are two rational readings of a criminal statute, one harsher than the other," the rule of lenity tells us that "we are to choose the harsher only when Congress has spoken in clear and definite language." *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003) (applying the rule of lenity to the Hobbs Act) (internal quotation marks and brackets omitted); *Cleveland v. United States*, 531 U.S. 12, 25 (2000); *Jones*, 529 U.S. at 858.  Congress did not clearly criminalize paying bribes to public officials by the mere act of adding a conspiracy clause to the Hobbs Act. The government remains free to charge private individuals with violating the Hobbs Act when they conspire with public officials or aid and abet them in an extortion scheme; it just must satisfy the "property from another" and "with his consent" requirements in doing so.  *See United States v. Collins*, 78 F.3d 1021, 1032 (6th Cir. 1996) (upholding a conviction of a Kentucky governor's husband for a conspiracy to extort political contributions and investments in a thoroughbred partnership in exchange for access to state contracts); *United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2006) (upholding the conviction of a county executive's wife for "conspiring with a public official to commit extortion" where the public contracts were granted in exchange for private financial gain).

Basic notions of federalism also undermine the government's interpretation.  "[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes." *Jones*, 529 U.S. at 858 (internal quotation marks

omitted); *see BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States."); *Rewis v. United States*, 401 U.S. 808, 812 (1971) (limiting reach of the Travel Act because "Congress would certainly recognize that an expansive [interpretation] would alter sensitive federal-state relationships, [and] could overextend federal police resources"). No one doubts that the States have criminal laws prohibiting their citizens from bribing public officials. Is there any reason to doubt the States' willingness to invoke these laws when their citizens engage in schemes as brazen as this one? We cannot think of one, and we certainly cannot think of one here. The Tennessee authorities already have indicted the Brocks for bribing a public official under state law. *See* Mike Brock Br. Addendum; Tenn. Code Ann. § 39-16-102. Necessity may well be the motherhood of invention, but it is not a guide for construing statutes; it is not a guide for construing *criminal* statutes; and it is still less a guide for inventing a construction that the (state-prosecuted) bribes in this case do not even demand.

In urging us to uphold the Brocks' convictions, the government acknowledges that we have not decided this issue but suggests that we follow the reasoning of four other courts. *See United States v. Cornier-Ortiz*, 361 F.3d 29 (1st Cir. 2004); *United States v. Spitler*, 800 F.2d 1267 (4th Cir. 1986); *United States v. Wright*, 797 F.2d 245 (5th Cir. 1986); *United States v. Nelson*, 486 F. Supp. 464 (W.D. Mich. 1980). Only one of the cases, *Spitler*, analyzed an extortion conspiracy, and it did not consider the textual anomalies raised here. *Spitler* involved a payor of bribes (Spitler) and a public official who received them (Carpenter); the point of the fraud scheme was for Carpenter, an employee of the State of Maryland, to approve the overbillings of the company for which Spitler worked (TEI). The case did not address whether Spitler had conspired to obtain "property from another"—perhaps because there was "another" unrelated entity outside the conspiracy whose property was obtained. As the indictment indicated, "Spitler, on behalf of TEI, would and did provide Carpenter with items of value, including weapons and jewelry," 800 F.2d at 1278 n.9, and those items were purchased "with TEI funds," *id.* at 1269. Spitler thus facilitated the extortion of TEI's property, not his own. That did not happen here because the supposed point of the extortion conspiracy, so far as the evidence shows, was to extort the Brocks' cash payments, JA 362, 381, 387, 402, which apparently came out of the Brocks' bank accounts or Brock Bonding's bank account (the record does not say), not property from an unrelated entity outside the conspiracy.

Perhaps more importantly, the primary debate in *Spitler*, as in the other three cases upon which the government relies, did not concern the "property from another" requirement but something else—whether the prohibitions of the Hobbs Act could be extended to the "victim" of an extortion scheme (the giver of the bribe), as opposed to the public official (the taker of the bribe), under a conspiracy theory or an aiding and abetting theory, *see* 18 U.S.C. § 2. The cases all suggest that perpetrators of extortion schemes may be treated as Hobbs Act conspirators or aiders and abettors, but victims may not be. *See Cornier-Ortiz*, 361 F.3d at 40; *Spitler*, 800 F.2d at 1275–79; *Wright*, 797 F.2d at 252–53; *Nelson*, 486 F. Supp. at 490.

Nothing in the statute, however, creates any such dichotomy, and indeed none of the cases looked to the statute to come up with this distinction. The statute refers to the "obtaining of property from another, with his consent, . . . under color of official right." 18 U.S.C. § 1951(b)(2). It thus is not extortion, but robbery, if the victim gives the property without consent; all victims of extortion must consent to give the money to the public official. Why, under these circumstances, bribers of public officials are necessarily perpetrators of Hobbs Act violations rather than Hobbs Act victims, how the distinction matters to the statute and what the line is between the two are questions these cases never answer. *See, e.g.*, *Cornier-Ortiz*, 361 F.3d at 40 (noting that "we need not delineate the precise location of the line at which a payor's conduct constitutes sufficient activity beyond the mere acquiescence of a victim") (internal quotation marks omitted); *Nelson*, 486 F. Supp. at 486 (noting

that "the payor of extorted money can be charged with aiding and abetting in only a narrow set of circumstances" and delaying on ruling on whether this case was one of them).

In reaching this conclusion, the four cases also rely on two Supreme Court decisions construing the Mann Act—*United States v. Holte*, 236 U.S. 140 (1915), and *Gebardi v. United States*, 287 U.S. 112 (1932). But neither decision justifies this distinction either. That law punished "any person who shall knowingly transport or cause to be transported, or aid or assist in obtaining transportation for . . . any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose." Mann Act, Pub. L. No. 61-277, 36 Stat. 825 (codified as amended at 18 U.S.C. § 2421). In *Holte*, the Court explained that a woman who actively procured her transportation could theoretically "be within the letter of the act" and therefore saw "little reason for not treating the preliminary agreement as a conspiracy that the law can reach" under the right set of circumstances. 236 U.S. at 145. In *Gebardi*, by contrast, the woman did not procure her transportation, and the Court held that she could not be an aider or abettor or coconspirator in a Mann Act violation. *See* 287 U.S. at 123. All that these cases establish is that some women, but not others, theoretically could fall within the terms of the Act; they have nothing to say about whether the Brocks fall within the differently worded Hobbs Act.

Two of the lower court cases also relied on the legislative history of the Hobbs Act, principally a provision stating that Congress intended to punish "those persons who have been impeding interstate commerce and levying tribute from free-born Americans engaged in interstate commerce." *Spitler*, 800 F.2d at 1276 (quoting H.R. Rep. No. 79-238 (1946)); *Nelson*, 486 F. Supp. at 490 (same). Even if legislative history may *extend* the reach of a textually ambiguous *criminal* law—a dubious proposition, *see United States v. R.L.C.*, 503 U.S. 291, 307 (1992) (Scalia, J., concurring in part and concurring in the judgment, joined by Kennedy, J., and Thomas, J.)—this legislative history is so vague as to count not even as a "friend[]" in the "crowd." Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195, 214 (1983) (quoting Judge Leventhal). If anything, the statement cuts the other way, as it refers to punishing "those persons . . . levying tribute from free-born Americans," not those from whom tribute is levied.

Also unhelpful is the government's reliance on the proposition that the Hobbs Act "manifest[s] a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States*, 361 U.S. 212, 215 (1960). That statement shows only that Congress meant to use the full extent of its authority under the Interstate Commerce Clause, not that it meant to punish everything remotely connected to extortion or robbery. Reading this provision as the government does, moreover, undercuts its own theory of prosecution. Under the government's theory, the Act distinguishes among those who perpetrate an extortion scheme, those who acquiesce in it and those who are victimized by it. If the Act is meant to reach every conceivable participant in an extortion scheme, members of all three groups should be covered by the Act.

Not only does the Act fail to support a perpetrator/acquiescor/victim distinction but it also is by no means clear how such a distinction would work. Because all Hobbs Act prosecutions require the "consent" of the payor, it will be difficult to ascertain what level of enthusiasm, ambivalence or regret is required to escape prosecution. In passing the Act, Congress already drew several distinctions—among those who are robbed (their property is taken "against [their] will"), those who are extorted (their property is obtained "with [their] consent"), those who are extorted through coercion (their consent is "induced by wrongful use of actual or threatened force, violence, or fear") and those who are extorted by public officials (their consent is given to one acting "under color of official right"). 18 U.S.C. § 1951(b)(2). Faced with a statute that already draws these lines, what warrant do we have to draw several more on our own? Either the Act picks up all perpetrators, acquiescors and victims, or it picks up none of them. We say it picks up none of them and would

leave it to Congress (if it wishes) to do what it has done before: Make it a crime to offer or give a bribe to a public official. *See, e.g.*, *id.* §§ 201; 210; 212; 226.

III.

Unlike the Brocks, Webb does not challenge the legal or factual theory underlying his conviction but instead argues that the district court improperly disqualified Hanzelik from representing him and improperly sentenced him. We review the district court's decision to disqualify Hanzelik for abuse of discretion, *see Serra v. Mich. Dep't of Corrs.*, 4 F.3d 1348, 1354 (6th Cir. 1993), and Webb's 48-month sentence for reasonableness, *see United States v. Booker*, 543 U.S. 220, 261–62 (2005).

A.

Webb argues that by disqualifying Hanzelik the district court violated Webb's Sixth Amendment right to choose his own counsel. But the right to choose one's counsel is not absolute, and "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Although a defendant "should be afforded a fair opportunity to secure counsel of his own choice," *Powell v. Alabama*, 287 U.S. 45, 53 (1932), and the court "must recognize a presumption in favor of [a defendant's] counsel of choice," *Wheat*, 486 U.S. at 164, "a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel," *id.* at 160; *see also* Fed. R. Crim. P. 44(c)(2). In view of the competing interests at play, *see Serra*, 4 F.3d at 1353, a district court has "substantial latitude" to deny a waiver of the conflict upon a "showing of a serious potential for conflict," *Wheat*, 486 U.S. at 163–64.

The district court did not exceed this "substantial latitude" in finding a serious potential for conflict here. Michael Brock and Webb were codefendants charged with conspiring in a common scheme to bribe Simcox, and they had a history of criminal activity together. Because the government knew that Webb originally had helped Michael Brock finance Brock Bonding (and suspected that Webb remained a "silent partner" in the business, JA 311), it reasonably expected that one or the other would be amenable to a plea agreement, receiving a favorable sentence in exchange for the pleader's assistance in convicting the other. Facing this joint representation of defendants in a case with interlocking proof—a classically "suspect" situation because it "tends to prevent" an attorney from vigorously representing each client, *Holloway v. Arkansas*, 435 U.S. 475, 489–90 (1978)—the district court permissibly concluded that Hanzelik faced a serious conflict of interest in continuing to represent both Michael Brock and Webb.

Webb responds that, even if Hanzelik faced a conflict of interest, Webb adequately waived the conflict, and a court cannot ignore such waivers absent "compelling circumstances." *See United States v. Reese*, 699 F.2d 803, 805 (6th Cir. 1983). One problem with this argument is that *Reese*'s dictum does not account for *Wheat*'s later instruction that appellate courts must give the district courts "substantial latitude in refusing waivers of conflicts of interest." 486 U.S. at 163. And given that the district court based its decision not only on its first-hand evaluation of the witnesses but also on its direct interactions with Hanzelik, there is little reason to set aside the "informed judgment of the trial court." *Id.* at 164.

Perhaps a greater obstacle for Webb is that the waiver of a constitutional trial right must be knowing and intelligent, *see Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), and the very face of Webb's affidavit shows that he did not recognize the risks of joint representation. In his affidavit (which was nearly identical to Michael Brock's), Webb expressly stated that he was "unaware of any conflict of interest" and that he did "not feel that any of those things [discussed at the hearing]

presented a conflict for Mr. Hanzelik." JA 186. Perhaps Webb thought that no conflict could arise between Michael Brock and himself because the two were "best friends," JA 300, but the relevant question is whether Hanzelik could zealously represent each of his clients if their legal interests conflicted. Webb's explicit disregard for any conflict of interest, "actual or potential," JA 186, shows that he did "not clearly comprehend the risks here" and that he did "not know what [he was] waiving," JA 197. Absent an understanding of the dangers posed by Hanzelik's joint representation, Webb could not waive his right to effective, conflict-free representation. *See United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 2565 (2006) ("Nor may a defendant . . . demand that a court honor his waiver of conflict-free representation.").

B.

Webb challenges the procedural reasonableness of his sentence, claiming that the district court did not "sufficiently consider[] and address[]" all of the sentencing factors found in 18 U.S.C. § 3553(a) and "disregarded and ignored . . . the highly positive aspects of [Webb's] character." Webb Br. at 28. Because Webb did not raise these issues below, even after the district court asked his counsel whether he had "[a]ny objections to the sentence or the guidelines or anything else here that have not previously been raised," JA 661, we review the claim for plain error. *See United States v. Bailey*, 488 F.3d 363, 367 (6th Cir. 2007) (explaining that "when the district court asks at sentencing whether there are any objections to the sentence and the appellant raises none, we review the sentence only for plain error"); *accord United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004) (requiring district courts to "ask the parties whether they have any objections to [a] sentence just pronounced that have not previously been raised"). To withstand plain-error review, the litigant must show "(1) error, (2) that is plain, and (3) that affect[s] substantial rights" and that "(4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal quotation marks omitted).

No plain error occurred. To ensure reasonable sentencing, we require a district court to calculate the appropriate guidelines range, to appreciate the advisory nature of the guidelines and to consider the guidelines along with the other relevant statutory factors. *United States v. Davis*, 458 F.3d 491, 495 (6th Cir. 2006). The district court properly calculated the guidelines range (27–33 months) and acknowledged that the guidelines are now advisory. *See* JA 659. After noting that the § 3553(a) factors guided its decision, the court explained that "Webb has engaged in considerable additional criminal activity other than . . . what he was convicted of in this case," including Webb's admission that "he indeed burned other buildings" and that he attempted to bribe a detective while on supervised release. JA 659–60. The district court thought that Webb's criminal "history" was more relevant than the "nature and circumstances" of the charged offense, 18 U.S.C. § 3553(a)(1), in setting a sentence that would both "afford adequate deterrence to criminal conduct," *id.* § 3553(a)(2)(B), and "protect the public," *id.* § 3553(a)(2)(C). In sentencing Webb to 48 months' imprisonment, the district court rejected the guidelines' recommendation as not "enough" to deter Webb from committing further crimes and decided that a higher sentence was needed because Webb "obviously has very little respect for the law." JA 660; *see* 18 U.S.C. § 3553(a)(2)(A) (setting forth "the need for the sentence imposed . . . to promote respect for the law"). The court "waive[d] the fine due to [Webb's] inability to pay," JA 661; *see* 18 U.S.C. § 3553(a)(3), and it imposed a three-year term of supervised release on Webb, with the condition that he not "possess a firearm, destructive device, or any other dangerous weapon," including "the Score hair gel mixture" that Webb had used to create incendiary devices in the past, JA 661; *see* 18 U.S.C. § 3553(a)(1).

To the extent Webb contends that the district court did not thoroughly discuss every § 3553(a) factor, we need note only that the district court has laid out "a reasoned basis for exercising [its] own legal decisionmaking authority." *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007); *see also United States v. Williams*, 436 F.3d 706, 708–09 (6th Cir. 2006) ("[T]his court has never required the ritual incantation of the factors to affirm a sentence.") (internal quotation marks

omitted). And insofar as Webb argues that the district court failed to consider his mitigating arguments adequately, *see United States v. Richardson*, 437 F.3d 550, 554 (6th Cir. 2006), he cannot clear two hurdles to relief. First, any error could hardly be plain since the district court sentenced Webb *before* this court decided *Richardson*. Second, and more importantly, a district court need not "exhaustively explain" why it chose one sentence over another, *United States v. Gale*, 468 F.3d 929, 940 (6th Cir. 2006), so long as the district court provides the "specific reason for the imposition of [the] sentence" if it is outside the guidelines range, 18 U.S.C. § 3553(c)(2). *See also Gale*, 468 F.3d at 940 ("A sentencing judge has no more duty than we appellate judges do to discuss every argument made by a litigant.") (internal quotation marks omitted). Because the district court satisfied these modest requirements here, the imposition of Webb's sentence was procedurally proper.

## C.

Webb also claims that his 48-month sentence—a 45% variance over the guidelines-recommended sentence—is substantively unreasonable. The district court did not abuse its discretion in imposing this sentence. It had compelling evidence that Webb had little if any respect for the law, *see* JA 139 (Webb, stating in a magazine interview that "I would say criminal is a word you could use to describe me. Like I said, I fractured a few laws. Damn, I broke a lot of them. I bent some rules and I broke some laws."), that Webb had committed arson in the past without getting caught, *see id.* (Webb, stating that "I've burned some [buildings] down. (laughs) Statute of Limitations run out. I've burned some [buildings] down in my past."), and that Webb had attempted to bribe a state official, *see* JA 660. These reasons are surely sufficient to distinguish Webb from the average guidelines offender and to support this variance. *See United States v. Cherry*, 487 F.3d 366, 372 (6th Cir. 2007) (upholding 43% downward variance even though the appellate court "might have adhered to the Guidelines or imposed a harsher sentence were [it] in the position of the sentencing court"). And given the statutory maximum of 240 months' imprisonment, *see* 18 U.S.C. § 844(a)(2), Webb's sentence of 48 months' imprisonment (20% of the maximum) leaves plenty of room to distinguish Webb from more serious and less serious offenders. *Accord Cherry*, 487 F.3d at 372 ("[T]he district court in this case imposed a sentence that . . . [left] ample room to sentence future defendants who may prove more deserving of a variance . . . ."); *accord also United States v. Poynter*, No. 05-6508, __ F.3d ___, 2007 WL 2127353, at *6 (6th Cir. July 26, 2007); *Davis*, 458 F.3d at 499.

## IV.

For these reasons, we affirm the conviction and sentence of Darrin Webb and reverse the convictions of Michael and Jerry Brock and remand for further proceedings.