GRIFFIN, Circuit Judge, dissenting.
In my view, Fitzgerald's preparatory actions amounted to merely an attempt to operate the air common carrier. Because Congress failed to include an attempt provision in 18 U.S.C. § 342, I would hold that as a matter of law Fitzgerald did not "operate" the air common carrier. I therefore respectfully dissent.
I.
"Operate" is a vague word with myriad meanings. See , e.g. , Oxford English Dictionary 848 (2d ed. 1989) (outlining eight definitions for "operate"); Random House Dictionary of the English Language 1357 (2d ed. 1987) (twelve definitions); American Heritage Dictionary of the English Language 1268 (3d ed. 1992) (seven definitions). Congress chose not to tell us what the word means in § 342, so we must give it the ordinary meaning it had when Congress enacted the statute. See United States v. Santos , 553 U.S. 507, 511, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008) (plurality op.); United States v. Miller , 734 F.3d 530, 540 (6th Cir. 2013) ; see also Antonin Scalia & Bryan A. Garner, Reading Law 78 (2012) (discussing the fixed-meaning canon of statutory construction, which provides that words must be given the meaning they had when the statute was enacted).
Context lets us home in on which of the many ordinary meanings of "operate" Congress must have meant. Section 342 uses "operate" in the transitive sense and makes "common carrier" the direct object. Thus, the ordinary meaning we seek must be transitive and must take a direct object similar to a common carrier. The majority identifies four possible ordinary meanings, each of which uses the term in the transitive sense and takes a direct object similar to a common carrier. Although the majority never tells us why it ultimately chooses the American Heritage's definition, I have no qualms with the choice because that definition is the most descriptive of the group. I therefore agree that the ordinary meaning of "operate" is "to control the functioning of." American Heritage Dictionary of the English Language 1268 (3d ed. 1992). I also agree that the *452 definition fails to provide "obvious limiting principles" that resolve this appeal. And I agree that without such principles we must look to context.
But that is where my agreement ends. The majority accepts Fitzgerald's contention that context requires us to define "operate" by reference to movement because § 342 extends only to the operation of common carriers, which transport public passengers or freight from place to place. Then my colleagues go a step further: they subdivide common carriers into various vehicle types. Yet what at first glance seems "natural and sensible," is in fact my colleagues' most critical mistake. Yes, Congress also subdivided common carriers into vehicle types, but not the same vehicle types the majority lists. As relevant here, Congress defined "common carrier" to include an "air common carrier," 18 U.S.C. § 341, but my colleagues mention only an "airplane."
This distinction matters. Just as a square is always a rectangle but a rectangle is not always a square, an air common carrier is always an airplane but an airplane is not always an air common carrier. "A statute that uses a common-law term, without defining it, adopts its common-law meaning." Reading Law at 320 (discussing the Canon of Imputed Common-Law Meaning). Here, although Congress has defined "common carrier," the definition is self-referential: a "common carrier" includes an "air common carrier." 18 U.S.C. § 341. In other words, by using a common-law term to define itself, Congress hasn't actually defined the term. So we must give the term its common-law meaning. We find that meaning in Black's Law Dictionary , which defines "common carrier" as "[a]ny carrier required by law to convey passengers or freight without refusal if the approved fare or charge is paid[.]" Black's Law Dictionary 275 (6th ed. 1990); Black's Law Dictionary 249 (5th ed. 1979) (same).
Thus, an airplane may or may not be an air common carrier at any given time; whether it is depends on its ownership and use. If, for example, an airline crew flies an empty airplane from one airport to another, the airplane is not an air common carrier because it is not transporting public passengers or freight. The same is true if the airplane carries only airline employees traveling on the clock because they are needed in another city. Put simply, for an airplane to be an air common carrier, it must transport public passengers or freight. This means that an air common carrier functions not simply by flying or moving, but by transporting such passengers or freight. To "operate" an air common carrier by "control[ling] its functioning," then, one must control its transport of public passengers or freight.
This Fitzgerald did not do. During his time in the cockpit, passengers never boarded and the aircraft never moved. Although he took preparatory actions, he never controlled the air common carrier's transport of passengers because there were never any passengers and there was never any transport. That means that as a matter of law Fitzgerald did not "operate" the air common carrier.
What he did do was attempt to operate it. An attempt crime requires proof that a defendant: (1) intended to commit the proscribed criminal conduct and (2) took a "substantial step" towards completing that conduct. United States v. Resendiz-Ponce , 549 U.S. 102, 106-08, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007). Here, by every indication, Fitzgerald intended to control the aircraft's transport of passengers; he repeatedly insisted he was fit to fly and began to prepare the aircraft for its journey. And each action he took-calibrating the altimeter, programming the flight-management *453 system, starting the auxiliary-power unit-was undoubtedly a substantial step toward operating the aircraft; as the majority notes, these steps were necessary for takeoff. These actions, however, amounted to only thirty percent of the pre-flight preparations necessary for takeoff; it would have taken approximately forty-five more minutes of preparation before the aircraft could have departed.
Congress could have included an attempt provision in the statutory framework but did not. When Congress wants to criminalize the attempt to commit a crime, "it knows exactly how to do so," Epic Sys. Corp. v. Lewis , --- U.S. ----, 138 S.Ct. 1612, 1626, 200 L.Ed.2d 889 (2018), and has done so time and again with other crimes. See , e.g. , 18 U.S.C. § 1113 (making it a crime to attempt to commit murder within the special maritime and territorial jurisdiction of the United States); 18 U.S.C. § 2251(e) (making it a crime to attempt to produce child pornography); 21 U.S.C. § 846 (making it a crime to attempt to commit drug offenses); 26 U.S.C. § 7201 (making it a crime to attempt to evade taxes).
Indeed, for years, Congress has had specific examples of how to create an attempt provision to punish pilots who do as Fitzgerald did. The Federal Aviation Administration's regulations provide that "[n]o person may act or attempt to act as a crewmember of a civil aircraft" (1) within eight hours of consuming an alcoholic beverage; (2) while under the influence of alcohol; (3) while using any drug that impairs one's faculties; or (4) with a blood-alcohol content above 0.04%. 14 C.F.R. § 91.17(a) (emphasis added). Similarly, the State of Michigan has made it a crime to "operate an aircraft or act or attempt to act as a crew member of an aircraft over or upon the lands or waters of [the] state" with a blood-alcohol content above 0.02%. Mich. Comp. Laws § 259.185(2) (emphasis added). Here, state prosecutors even charged Fitzgerald with violating § 259.185(2) -alleging that he "did attempt to act as a crew member of the aircraft"-before federal prosecutors took over the case (which led to the dismissal of the state charge without prejudice). (Emphasis added).
II.
Instead of noting § 342 's lack of an attempt provision and pointing it out to Congress, my colleagues go outside our purview as judges and rewrite the law to implement their own policy preference-one that favors punishing not only intoxicated pilots who endanger passengers but also those who almost endanger them. The result is an expansion of § 342 to include an attempt provision that isn't there.
A.
The majority first invokes the Supremacy-of-Text Principle, Reading Law at 56-58, by noting that we consider which permissible interpretations "would serve, rather than frustrate, the statute's manifest purpose." Rather than looking to § 342 's text to determine whether the statute has a manifest purpose and, if so, what that purpose is, the majority simply assumes that Fitzgerald's proposed purpose-the protection of passengers during movement-is the statute's manifest purpose.
Doing so violates three of the four limitations on this principle, none of which my colleagues mention. "First, the purpose must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires." Id . at 56. "Second, the purpose must be defined ... not in a fashion that smuggles in the answer to the question before the decision-maker." Id . To find a *454 specific purpose "in the absence of a clear indication in the text is to provide the judge's answer rather than the text's answer to the question." Id . at 57. And third, purpose cannot be used to supplement a statute's text. Id . "[T]he limitations of a text-what a text chooses not to do-are as much a part of its 'purpose' as its affirmative dispositions." Id .
Here, when identifying § 342 's purpose, the majority looks no further than Fitzgerald's brief; my colleagues never consult the statute's text. Examination of the text reveals several potential purposes, but no manifest one. Section 342 was a small piece of the sweeping Anti-Drug Abuse Act of 1986, the preamble of which lists purposes of "eradicating illicit drug crops," "halting international drug traffic," "improv[ing] enforcement of Federal drug laws," establishing drug abuse prevention and treatment programs, and "other purposes." See Pub. L. No. 99-570, 100 Stat. 3207. None of the enumerated purposes fits § 342 's content, so its purpose must be one of the "other purposes."
To be sure, the protection of passengers by deterring the drunken preparation of common carriers is one potential purpose. But it is not alone. Another equally possible and plausible purpose is a punitive one: punishing those who endanger public passengers by drunkenly controlling the transport of such passengers. Congress might well have seen a difference in harm-and thus imposed a difference in punishment-between the drunken preparation of common carriers and the drunken control of their movement. After all, as happened here, it is possible to correct dangerous mistakes made prior to movement and thus to take passengers out of harm's way; co-workers, security personnel, local law enforcement, and others can step in. Once a common carrier is loaded and in transit, however, intervention becomes much more difficult. Perhaps Congress meant to reserve federal prosecution and the consequences that come with it for only those pilots who actually endanger public passengers by drunkenly controlling an air common carrier's movement-a scenario in which the risk of harm has gone from potential to actual.
My point is not that this punitive purpose was in fact what motivated Congress, but simply that § 342 's text leaves us unable to identify a manifest purpose, much less one we can treat as the statute's sole purpose and use to dismiss Fitzgerald's proposed interpretation. We are judges, not legislators, and what my colleagues call "unworkab[le]", I call a policy choice well within Congress's discretion.
B.
The majority also invokes the Presumption Against Ineffectiveness, which "ensures that a text's manifest purpose is furthered, not hindered." Reading Law at 63. Although the majority cites The Emily & the Caroline , 22 U.S. (9 Wheat.) 381, 6 L.Ed. 116 (1824) to support its analysis, the case demonstrates exactly why the presumption has no application here. As Reading Law discusses:
The Slave Trade Act of 1794 [1 Stat. 347, § 1] forbade anyone to "build, fit, equip, load, or otherwise prepare, any ship of vessel, within any port or place of the said United States ... for the purpose of carrying on any trade or traffic in slaves"-or else the ship or vessel would be forfeited. The crucial word was prepare : Did it mean to begin preparations, or to complete them? The evidence indisputably showed that the ships would be used to transport slaves, but the shipowners argued that the ships could not be "prepared" if they were not yet ready for use toward that purpose. The Supreme Court of the *455 United States held that this interpretation would render "evasion under the law ... almost certain":
As soon ... as the preparations have progressed, so far as clearly and satisfactorily to show the purpose for which they are made, the right of seizure attaches. To apply the construction contended for on the part of the claimant, that the fitting or preparation must be complete, and the vessel ready for sea, before she can be seized, would be rendering the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner. [ The Emily & the Caroline , 22 U.S. at 389.]
In other words, the vessel would never be fully "prepared" until it set sail, and would therefore be much harder to seize.
Reading Law at 63-64. What is important is that the Slave Trade Act of 1794 had a manifest purpose: to prevent domestic ships and vessels from trafficking slaves. This we can glean from the penalty for violating the prohibition; forfeiture rather than imprisonment demonstrates Congress's desire to prevent future violations rather than to punish for past ones. In other words, the Principle Against Ineffectiveness applied in The Emily & the Caroline because the statute at issue had only one purpose-a purpose that one interpretation furthered and the other hindered.
The same cannot be said for § 342. As discussed above, § 342 's text leaves us unable to identify a manifest purpose. This, alone, means the Presumption Against Ineffectiveness has no application here. And even if we could say that the statute's manifest purpose was to protect passengers, it would not follow that a narrow interpretation would remove § 342 's "most meaningful bite." This logic "smuggle[s] in the answer to the question" by "assuming what is to be proved," Reading Law at 56-57: that § 342 had such a bite to begin with. It also treats § 342 as the only safeguard to the drunken preparation of an air common carrier when the statute is neither unique nor what prevented the risk of harm to passengers in this case. Authorities arrested Fitzgerald on a state charge; it wasn't until later that the United States indicted him under § 342.
My colleagues further reason that, "as with the Emily and Caroline ships," "[i]f 'operate' started with movement, 'evasion of the law'-at least until the danger [ § 342 ] sought to prevent had already materialized-would be 'rendered almost certain.' " The comparison is inapt. When Congress passed the Slave Trade Act of 1794, evasion of the law via ship or vessel was easy because our nation was in its infancy-we didn't even have a Navy. See the Naval Act of 1794, 1 Stat. 350 (passed five days after the Slave Trade Act of 1794's passage). In modern times, we seem to track everything-every flight, every voyage, every bus route-simply as a matter of course. Long gone are the days when a commercial vehicle can travel into the horizon unnoticed. Regardless, my colleagues' reasoning again incorrectly assumes that § 342 's manifest purpose is to protect passengers from the dangers that arise when someone drunkenly prepares a common carrier-something the text just doesn't tell us.
C.
The majority invokes the Absurdity Doctrine as well, which allows us to disregard or correct a provision-if the correction is textually simple-when we find an error that, if ignored, "would result in a disposition that no reasonable person could approve." Reading Law at 234. The doctrine has two limits: (1) "[t]he absurdity must consist of a disposition that no reasonable *456 person could intend" and (2) "[t]he absurdity must be reparable by changing or supplying a particular word or phrase whose inclusion or omission was obviously a technical or ministerial error." Id . at 237-38.
"The doctrine does not include substantive errors arising from a drafter's failure to appreciate the effect of certain provisions," id . at 238, and one example of the doctrine's application is enough to show why it plays no role in this case. The Arkansas legislature once passed a law stating in relevant part: "All laws ... are hereby repealed." Act 17 of 1945 (repl. 1980). As the Arkansas Supreme Court later noted, the act had not in fact repealed every law in the State: "No doubt the legislature meant to repeal all laws in conflict with that act, and, by error of the author or the typist, left out the usual words 'in conflict herewith,' which we will [infer] by necessary construction." Cernauskas v. Fletcher , 211 Ark. 678, 201 S.W.2d 999, 1000 (1947) ; see also Reading Law at 236-37 (discussing the case as an example of when the Absurdity Doctrine properly applies).
Here, the majority outlines not an absurdity leading to a result that no reasonable person could intend, but an alleged substantive error arising from the drafter's failure to account for the dangers one can create by drunkenly preparing a common carrier for movement.
D.
Finally, there is the rule of lenity. To be sure, I view § 342 's text, read within the statute's context, as leaving no doubt in this case. So do my colleagues, but they see no doubt as to Fitzgerald's guilt rather than his innocence. Nevertheless, the rule of lenity is further support for adopting a narrow reading of "operate" and is yet another legal concept my colleagues misapply.
The majority tells us that we only use the rule "when the usual tools of statutory construction leave us with a 'grievous ambiguity.' " (Citing Chapman v. United States , 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) ). Although that is one formulation of when to apply the rule, it is not the only one. The Supreme Court has given us at least five formulations for determining when the rule of lenity applies:
? "[O]nly when the equipoise of competing reasons cannot otherwise be resolved." Johnson v. United States , 529 U.S. 694, 713 n.13, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000).
? When the court "can make no more than a guess." Reno v. Koray , 515 U.S. 50, 65, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (internal quotation marks omitted).
? When the court is "left with an ambiguous statute." Smith v. United States , 508 U.S. 223, 239, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (citation omitted).
? When the court is left with "grievous ambiguity or uncertainty." Muscarello v. United States , 524 U.S. 125, 139, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (citation omitted).
? When, after all the legitimate tools of interpretation have been applied, "a reasonable doubt persists." Moskal v. United States , 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990).
Our Circuit has also given varying formulations for when to apply the rule:
? "[A]s a tiebreaker of last resort[.]" United States v. Morales , 687 F.3d 697, 701 (6th Cir. 2012) (internal quotations omitted).
*457 ? "[W]hen the plain language, structure, and legislative history provide no guidance[.]" United States v. King , 516 F.3d 425, 432 (6th Cir. 2008).
? "When there are two rational readings of a criminal statute" and Congress hasn't spoken in "clear and definite language." United States v. Brock , 501 F.3d 762, 768 (6th Cir. 2007) (citations omitted), abrogated on other grounds, Ocasio v. United States , --- U.S. ----, 136 S.Ct. 1423, 1428-29, 194 L.Ed.2d 520 (2016).
? "[W]here significant doubt or uncertainty lingers." United States v. Canelas-Amador , 837 F.3d 668, 675 (6th Cir. 2016).
Of these different standards, I would apply the Moskal formulation-one penned by Justice Thurgood Marshall and endorsed by Justice Scalia. See Reading Law at 299. Under this formulation, the rule of lenity would militate against adopting a broad reading of "operate" because reasonable doubts abound. After applying all the legitimate tools of interpretation, we are left with a vague, undefined word; no clear, manifest statutory purpose; and a self-referential definition. "[W]hen the government means to punish, its commands must be reasonably clear. When they are not clear, the consequences should be visited on the party more able to avoid and correct the effects of shoddy legislative drafting-namely, the federal Department of Justice or its state equivalent." Id .
But regardless of which formulation we apply, one thing is certain: the majority's view of the rule of lenity is that there is no rule of lenity. If Fitzgerald had "fair notice that he was acting illegally," my colleagues reason, the rule of lenity is a "poor fit" for this case. And "[e]very American from their teenage years onward understands the delinquency inherent in drunk driving," they continue, so Fitzgerald had proper notice. The major premise in this syllogism is lacking, and the minor premise simply does not lead to the conclusion the majority draws. For the rule of lenity to be rendered inapplicable, Fitzgerald needed more than notice that his conduct was delinquent, generally; he needed notice that he was acting in violation of § 342, specifically. See United States v. Lanier , 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (noting that the rule of lenity "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered"); Liparota v. United States , 471 U.S. 419, 427, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability."). Yet under the majority's conception of the rule of lenity, anytime some law, somewhere, prohibits an act, a person who so acts can be convicted of violating any law, anywhere, that prohibits it-even if the prohibition is unclear. If that is so, the rule of lenity is no more.
III.
The majority makes a strong case for amending § 342 to add further protection for passengers or freight by deterring the intoxicated preparation of common carriers. But that amendment should come from Congress, not from us judges. I would hold that Fitzgerald attempted to "operate" a common carrier but did not do so because he did not complete the proscribed offense. For this reason, I would vacate Fitzgerald's conviction and remand for the entry of a judgment of acquittal.