Granted by Supreme Court March 2, 2015

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————

**No. 12-4462**

—————

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

SAMUEL OCASIO,

Defendant – Appellant.

—————

Appeal from the United States District Court for the District of Maryland, at Baltimore.   Catherine C. Blake, District Judge. (1:11-cr-00122-CCB-13)

—————

Argued:  December 11, 2013          Decided:  April 29, 2014

—————

Before MOTZ, KING, and SHEDD, Circuit Judges.

—————

Affirmed in part, vacated in part, and remanded by published opinion.  Judge King wrote the opinion, in which Judge Motz and Judge Shedd joined.

—————

**ARGUED:** Matthew Scott Owen, KING & SPALDING LLP, Washington, D.C., for Appellant.  Kathleen O'Connell Gavin, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Daniel S. Epps, KING & SPALDING LLP, Washington, D.C., for Appellant.  Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

—————

KING, Circuit Judge:

In 2012, a jury found defendant Samuel Ocasio, a former officer of the Baltimore Police Department (the "BPD"), guilty of four offenses relating to his involvement in a kickback scheme to funnel wrecked automobiles to a Baltimore auto repair shop in exchange for monetary payments. Ocasio was convicted on three Hobbs Act extortion counts, see 18 U.S.C. § 1951, plus a charge of conspiracy to commit such extortion, see 18 U.S.C. § 371. On appeal, Ocasio primarily maintains that his conspiracy conviction is fatally flawed and must be vacated. He also challenges a portion of the sentencing court's award of restitution. As explained below, we affirm Ocasio's conspiracy and other convictions, vacate the restitution award in part, and remand.

I.

A.

On March 9, 2011, Ocasio and ten codefendants were indicted in the District of Maryland in connection with the kickback scheme involving payments to BPD officers in exchange for referrals to a Baltimore business called Majestic Auto Repair Shop LLC (the "Majestic Repair Shop," or simply "Majestic"). Nine of the defendants were BPD officers, and the others were Herman Alexis Moreno and Edwin Javier Mejia, brothers who were

2

co-owners and operators of the Majestic Repair Shop. The single-count indictment alleged, pursuant to 18 U.S.C. § 371, that the defendants, along with others "known and unknown," conspired to violate the Hobbs Act, 18 U.S.C. § 1951, by agreeing to "unlawfully obtain under color of official right, money and other property" from Moreno, Mejia, and Majestic. See J.A. 18.[1] As such, the initial indictment both charged Moreno and Mejia with the conspiracy offense and identified them — as well as Majestic — as victims of the extortion conspiracy.

Seven months later, on October 19, 2011, the grand jury returned a seven-count superseding indictment charging only two defendants, Ocasio and another BPD officer, Kelvin Quade Manrich, who had not been named in the initial indictment. Thereafter, the conspiracy offense in the first indictment was dismissed as to each of the other defendants, in exchange for guilty pleas. Each defendant entered into a plea agreement with the government and pleaded guilty to a separately-filed superseding information, predicated on admitted involvement in the kickback scheme.[2] In connection with their guilty pleas, the

---

[1] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[2] Several of the BPD officer-defendants were convicted of a single count of Hobbs Act extortion under 18 U.S.C. § 1951, while other defendants were convicted of two offenses, Hobbs Act extortion and conspiring to commit extortion. On July 11, 2011, (Continued)

brothers Moreno and Mejia agreed that they would testify at Ocasio's trial.

Count One of the superseding indictment — naming both Ocasio and Manrich — repeated the charge of conspiring to violate the Hobbs Act, in contravention of 18 U.S.C. § 371. Counts Two through Four charged Manrich with Hobbs Act extortion, that is, extorting Moreno by "unlawfully obtaining under color of official right, money and property," in violation of 18 U.S.C. § 1951(a).  See J.A. 55.  Finally, counts Five through Seven charged Ocasio with Hobbs Act extortion of Moreno on three specific occasions — January 17, 2010, January 10, 2011, and January 15, 2011.[3]

In Count One, the superseding indictment alleged the § 371 conspiracy offense against Ocasio and Manrich in the following terms:

> From in or about the Spring of 2008, and continuing through at least February 2011, [Ocasio and Manrich], and others both known and unknown to the Grand Jury,

---

Moreno and Mejia each pleaded guilty to Hobbs Act extortion and conspiracy.

[3] The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  References in this opinion to Hobbs Act extortion refer to extortion committed under color of official right, as charged against Ocasio and Manrich.

4

did knowingly and unlawfully combine, conspire, confederate, and agree together, with other [BPD officers], and with Moreno and Mejia to obstruct, delay, and affect commerce and the movement of any article and commodity in commerce by extortion, that is, to unlawfully obtain under color of official right, money and other property from Moreno, Mejia, and [the Majestic Repair Shop], with their consent, not due the defendants or their official position, in violation of [the Hobbs Act].

J.A. 50. According to Count One, the purpose of the conspiracy was for "Moreno and Mejia to enrich over 50 BPD Officers . . . by issuing payments to the BPD Officers in exchange for the BPD Officers' exercise of their official positions and influence to cause vehicles to be towed or otherwise delivered to Majestic for automobile services and repair." Id. at 51. Count One spelled out two overt acts in furtherance of the conspiracy — a December 14, 2010 phone call between Manrich and Moreno, plus a January 15, 2011 call between Ocasio and Moreno — and incorporated by reference, as additional overt acts, each of the six substantive Hobbs Act extortion counts.

B.

The prosecutions underlying this appeal were the result of an extensive investigation conducted by the BPD and the FBI. The BPD began its investigation in the summer of 2009. When federal authorities joined the investigation in late 2010, the BPD had identified approximately fifty of its officers as possibly involved in wrongdoing with the Majestic Repair Shop.

5

In the winter of 2010, the FBI placed a wiretap on Moreno's telephone and began surveillance at both Majestic and at Moreno's residence. During the period from November 2010 to February 2011, the FBI recorded thousands of phone calls between Moreno and various BPD officers, including Ocasio and Manrich.

The trial evidence established a wide-ranging kickback scheme involving the Majestic Repair Shop and BPD officers.[4] The scheme was fairly straightforward: BPD officers would refer accident victims to Majestic for body work and, in exchange for such referrals, the officers would receive monetary payments. The payments made to BPD officers by the Majestic Repair Shop for their referrals of wrecked vehicles were made by both cash and check, and ranged from $150 to $300 per vehicle. After the kickback and extortion scheme began, knowledge of it spread by word-of-mouth throughout the BPD.

The referral of accident victims to the Majestic Repair Shop by BPD officers in exchange for money violated the BPD's established procedures. The BPD General Orders specify that BPD officers shall not violate any state or federal laws or city ordinances, or solicit or accept any "compensation, reward,

---

[4] Our factual recitation is drawn primarily from the trial record. In light of the guilty verdicts, we present the relevant facts in the light most favorable to the prosecution. See Evans v. United States, 504 U.S. 255, 257 (1992).

6

gift, or other consideration" without the permission of the Police Commissioner. See J.A. 49, 208-09. Pursuant to BPD General Order I-2, which specifies "towing procedures," if an accident victim in a non-emergency situation declines to contact her insurance company or other towing service (such as AAA), the BPD officer at the accident scene should call, through the BPD communications center, an already approved "Medallion towing company" to move the damaged vehicle.[5] In an emergency situation, i.e., when conditions are hazardous or a wrecked vehicle could impede traffic or cause further injuries, BPD officers have the discretion to contact a Medallion towing company to request towing services without first securing the consent of the wrecked vehicle's owner or operator. Regardless of whether a Medallion towing company is called for a wrecked vehicle, the "owner or operator [retains] full discretion to determine the destination to which the vehicle [is] to be towed." Id. at 213. Majestic was not, at any point during the Count One conspiracy, a Medallion towing company.

1.

The Count One conspiracy commenced in late 2008 or early 2009. Officer Ocasio first became involved in the kickback

---

[5] A Medallion towing company is a pre-approved towing business that has a contract with the City of Baltimore to provide towing services in connection with automobile accidents.

7

scheme in about May 2009, when, after learning about the scheme from another BPD officer, he called Moreno to request a tow truck for an accident. Moreno and Ocasio met for the first time at the scene of that accident. From May 2009 until about February 2011, Ocasio referred numerous vehicles to the Majestic Repair Shop, and received a cash payment on each occasion. On several occasions, Ocasio — who usually worked the BPD's night shift — called Moreno from an accident scene and described the damaged vehicles. If Moreno wanted a vehicle towed to Majestic, Ocasio would convince the driver that she should use Majestic's services and then arrange for the wrecked vehicle to be towed to Majestic.[6] After referring the wrecked vehicle to Majestic, Ocasio would call Moreno and request his cash payment of $300, usually by the next afternoon.

a.

Around midnight on January 17, 2010, Officer Ocasio responded to an accident scene in Baltimore. After determining that one of the wrecked vehicles was not driveable, Ocasio called the driver, a Mr. Taylor, to the BPD patrol car and gave

_____

[6] Although the Majestic Repair Shop was primarily a body shop, rather than a towing company, it owned and operated a tow truck and worked with at least one other towing business. The vehicles referred to Majestic by BPD officers were either towed to Majestic by its own tow truck, or Moreno arranged for wrecked vehicles to be towed there by other towing services.

8

him advice — that the Majestic Repair Shop should tow and repair Taylor's wrecked car. When Taylor told Ocasio that he had already called AAA, Ocasio convinced Taylor to cancel the AAA request and have his vehicle towed instead to Majestic. Ocasio then called Moreno to request a tow for Taylor. Almost immediately, Ocasio called Moreno again, asking him to delay his arrival at the accident scene because Ocasio's supervisor was nearby. Several minutes later, Ocasio called Moreno again to let him know that the coast was clear. Moreno, along with BPD Officer Leonel Rodriguez (who was already with Moreno when Ocasio called), arrived at the accident scene with a tow truck and towed Taylor's car to Majestic.[7] Ocasio called Moreno the following morning seeking his $300 cash payment for the referral.

b.

Several months later, in March 2010, a driver flagged Ocasio down around midnight to report that his vehicle had been vandalized. Ocasio, after ascertaining that the car could not be driven and was blocking a city street, recommended calling

---

[7] Moreno explained to the jury that Officers Rodriguez and Ocasio were friends and associates, and Moreno identified Rodriguez as the BPD officer who probably introduced Ocasio to the kickback scheme. Despite knowing each other, Rodriguez and Ocasio acted as strangers when both were present at the January 17, 2010 accident scene.

the Majestic Repair Shop. When the owner consented, Ocasio called Moreno to arrange for the tow. As a result, Moreno towed the vehicle to Majestic and performed repair work on it that was worth several thousand dollars. Ocasio called Moreno several times the next afternoon and arranged for his $300 cash referral payment.

On November 7, 2010, Officer Ocasio was again working the BPD's night shift. Around 4:00 that morning, Ocasio was called to an area of Baltimore where four parked vehicles had been hit by a fifth vehicle. Ocasio called Moreno to describe the four damaged vehicles and to see if Moreno would like any of them referred to the Majestic Repair Shop. During this call, Ocasio described the car that had collided with the parked vehicles, advising Moreno that it was "an Acura Legend" with "full cover," conveying to Moreno that the car at fault was a luxury vehicle and that its insurer would pay for the damages suffered by the other vehicles. See J.A. 416. Moreno expressed concerns to Ocasio about the values of the four damaged automobiles, questioning whether they would be worth towing and repairing. Ocasio then identified one of those cars as a 2006 Toyota, which interested Moreno because the Toyota was more valuable than the others. Ocasio advised Moreno that there was no need to tow the Toyota, however, because it could still be driven. In response,

10

Moreno suggested that Ocasio "talk to" the owner of the Toyota and convince him to have it towed to Majestic. Id. at 419.

After Moreno and Ocasio agreed that the Toyota should be referred to the Majestic Repair Shop, Ocasio identified its owner, a Mr. Tran, through the computer in a BPD patrol car. Despite the early morning hour and the fact that the Toyota was in operating condition, Ocasio went personally to Tran's home and misrepresented the accident situation. Ocasio falsely advised Tran that the accident report had to be completed that very morning. Officer Rogich, another BPD officer who was at the scene, explained otherwise to the jury, stating that he "wouldn't have knocked on [the owners'] doors," and "would have just left" accident report forms on the windshields of the damaged cars or at the owners' doors. See J.A. 926. While in Tran's residence, Ocasio recommended that Majestic fix the Toyota. Ocasio then called Moreno, who arrived soon thereafter and convinced Tran to have the Toyota towed to Majestic for repairs. Moreno also gave Tran documentation reflecting that his Toyota had been towed to Majestic. Rather than towing the Toyota, however, Moreno drove it from the accident scene to Majestic. En route, Moreno stopped at a nearby convenience store and met Ocasio. While there, Moreno withdrew $300 in cash from a Majestic bank account, which was paid to Ocasio.

11

c.

In the early morning hours of January 10, 2011, Officer Ocasio was called to the scene of a hit-and-run accident in Baltimore to translate for an accident victim, Mr. Quintanilla, who did not speak English. Quintanilla's SUV had been damaged in the accident, and it had been pushed off the street into a yard. The first BPD officer to respond to the scene concluded that there was no need to tow the SUV. Ocasio, after asking Quintanilla if he knew where the SUV could be fixed, recommended that it be towed to the Majestic Repair Shop. Ocasio then called Moreno to describe the damaged SUV, and Moreno responded by sending one of his associates to tow it to Majestic. That afternoon, Ocasio called Moreno seeking his referral fee. On January 14, 2011, Ocasio picked up Moreno at Majestic and they travelled together to a nearby ATM. Moreno then withdrew $300 in cash from a Majestic bank account and paid it to Ocasio.

d.

On January 15, 2011, Officer Ocasio made yet another referral to the Majestic Repair Shop. Shortly after 2:00 a.m., Ocasio arrived at the scene of a hit-and-run accident, being one of several BPD officers to respond. Ocasio had not been assigned to the accident by the BPD dispatcher, however, and should have been on "special detail" in another area of Baltimore. The wrecked vehicle was badly damaged and could not

12

be driven. Ocasio did not ask the car's owner if she had a towing company or speak to her about having her vehicle towed and repaired. He nevertheless called Moreno and requested that a tow truck be sent to the accident scene. In response, Moreno sent an associate, who had the car's owner sign paperwork authorizing the tow for her wrecked vehicle. Moreno's associate also gave the vehicle's owner a Majestic business card. Later that morning, Ocasio sent Moreno a text message asking to "pick up the money today before I go to work." J.A. 538. Ocasio then went to Moreno's home and collected $300 in cash.[8]

2.

Officer Ocasio also personally utilized the services of the Majestic Repair Shop. On January 29, 2010, Ocasio's wife was involved in a traffic accident that caused only slight damage to the rear bumper of her SUV. As a result, Ocasio called Moreno and asked that his wife's SUV be towed to Majestic. Because Ocasio's insurance company (GEICO) was unlikely to pay for such minor repairs, Ocasio overstated the SUV's damage on a GEICO claim form. Moreno then caused additional damage to the SUV —

_____

[8] The events of January 17, 2010, underlie the Hobbs Act extortion offense alleged against Ocasio in Count Five of the superseding indictment; the events of January 10 and 14, 2011, underlie Count Six; and, the events of January 15, 2011, underlie Count Seven. Counts Five, Six, and Seven are, in turn, incorporated into Count One as overt acts in furtherance of the extortion conspiracy.

which he subsequently repaired — consistent with the damage description that Ocasio had provided to GEICO on the claim form. Ocasio's insurance claim was paid in full and, because Ocasio's wife was not responsible for the accident, GEICO was reimbursed by the other driver's insurer (Erie Insurance) for the damage falsely claimed by Ocasio with respect to the SUV. In addition to the standard $300 cash referral fee, Majestic paid Ocasio's insurance deductible and car rental fees that were not covered by the insurers. As Moreno explained at trial, Majestic made those payments in an effort to keep Ocasio happy, with the hope that he would continue referring damaged vehicles to Majestic.

On December 29, 2010, Ocasio again called on the Majestic Repair Shop's towing and repair services for his personal needs. When Ocasio's private vehicle broke down in Baltimore, he called Moreno for a tow. Moreno advised Ocasio that he would take care of the towing fee and sent a friend from another towing service to tow Ocasio's vehicle. Rather than have his automobile towed to Majestic's shop, however, Ocasio had it towed to his residence. The towing fee was $150, more than Moreno had anticipated. When Moreno asked Ocasio to split the towing fee, Ocasio agreed to do so, but thereafter reneged on that arrangement.

14

Prior to Ocasio and Manrich's joint trial on the superseding indictment, the prosecution submitted its proposed jury instructions to the district court. In response, Ocasio made objections and submitted his own proposed instructions. Therein, Ocasio raised the primary argument that he pursues on appeal: that he could not be convicted of conspiring with Moreno and Mejia, because they were the victims of the alleged Hobbs Act extortion conspiracy. Ocasio's argument relied on United States v. Brock, 501 F.3d 762 (6th Cir. 2007), wherein the Sixth Circuit concluded that the victim of a Hobbs Act conspiracy must be a person outside the alleged conspiracy, i.e., the victim cannot also be a coconspirator in the extortion scheme.[9] The prosecution objected to Ocasio's proposed Brock

---

[9] Ocasio's proposed instruction concerning his Brock argument stated:

> In order to convict a defendant of conspiracy to commit extortion under color of official right, the government must prove beyond a reasonable doubt that the conspiracy was to obtain money or property from some person who was not a member of the conspiracy. Therefore, if you find that the only person or persons from whom a defendant conspired to obtain money by extortion under color of official right was another person or other persons who were also members of the conspiracy, then you must find the defendant not guilty of the conspiracy.

J.A. 136.

instruction, contending that his reliance on the Brock decision was foreclosed by applicable precedent.

The trial began in Baltimore on February 13, 2012. On February 22, 2012, after presenting twenty-four witnesses, the prosecution rested. Ocasio and Manrich each moved for judgments of acquittal. With respect to the Count One extortion conspiracy, Ocasio pursued his Brock argument that Count One rested on a legally impermissible theory under which he could not be convicted. The district court denied Ocasio's acquittal motion, as well as Manrich's, distinguishing Brock and concluding that this Court's decision in United States v. Spitler, 800 F.2d 1267 (4th Cir. 1986), controlled.

The following day, Manrich pleaded guilty to the charges lodged against him in the superseding indictment. Ocasio, however, proceeded with the trial and called five witnesses in his defense, three of whom were character witnesses. Ocasio himself did not testify. At the conclusion of the evidentiary presentations, Ocasio renewed his judgment of acquittal motion, which was again denied.

On February 24, 2012, prior to deliberations, the district court instructed the jury, including in those instructions the essential elements of the Hobbs Act conspiracy and extortion offenses lodged against Ocasio. The court did not instruct the jury on Ocasio's Brock argument. That afternoon, the jury found

16

Ocasio guilty of all charges against him, that is, conspiring to commit Hobbs Act extortion, plus three counts of Hobbs Act extortion.

On June 1, 2012, the district court sentenced Ocasio to eighteen months in prison, to be followed by three years of supervised release. The court also ordered Ocasio to make restitution to the BPD in the sum of $1,500.00, the aggregate value of the cash payments Ocasio had received from the Majestic Repair Shop. The prosecution sought further restitution with respect to Erie Insurance, predicated on the proposition that Ocasio had defrauded GEICO, which in turn had been reimbursed by Erie (as insurer for the at-fault driver involved in the accident with Ocasio's wife). At sentencing, the court deferred ruling on the Erie restitution issue and took the matter under advisement. The criminal judgment, without addressing the prosecution's restitution request with respect to Erie, was entered on June 5, 2012. On July 23, 2012, the court entered an amended judgment, directing Ocasio to make restitution to Erie in the sum of $1,870.58. That amount represented the difference between the total reimbursement made by Erie and the amount actually attributable to the Erie-insured motorist.

Ocasio timely noticed this appeal, and we possess jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

II.

On appeal, Ocasio maintains that the Count One conspiracy conviction is fatally flawed. Under Ocasio's theory, conspiring to extort property from one's own coconspirator does not contravene federal law, and thus the conspiracy offense was not proven and the district court erred in denying him an acquittal on Count One. Additionally, Ocasio challenges the restitution award to Erie Insurance, contending that Erie is not a victim of any of his offenses of conviction.

A.

We first address and reject Ocasio's contention that his Count One conspiracy conviction is legally invalid.[10] We review de novo a district court's denial of a motion for judgment of acquittal. See United States v. Smith, 451 F.3d 209, 216 (4th Cir. 2006). In conducting such a review, we must sustain a guilty verdict if, viewing the evidence in the light most favorable to the prosecution, it is supported by substantial evidence. See id. Moreover, we review de novo a question of

---

[10] Ocasio further posits that the fatally flawed Count One conspiracy charge enabled a prejudicial trial joinder with his alleged coconspirator Manrich, and, as a result, he is also entitled to a new trial on the three substantive Hobbs Act charges (Counts Five through Seven). Because we reject the premise that Ocasio's Count One conspiracy conviction is legally invalid, we must also deny his new trial request.

18

law, including an issue of statutory interpretation.  See United States v. Ide, 624 F.3d 666, 668 (4th Cir. 2010).

1.

Ocasio was convicted under 18 U.S.C. § 371 of conspiring with BPD officers, as well as Moreno, Mejia, and others known and unknown to the grand jury, to contravene the Hobbs Act by extorting three victims — Moreno, Mejia, and the Majestic Repair Shop.  Section 371, the general federal conspiracy statute, provides that such an offense occurs when

> two or more persons conspire . . . to commit any offense against the United States . . . in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy.

Consistent with the statutory language, the trial court instructed that, in order to convict Ocasio of the Count One conspiracy, the jury was obliged to find that the prosecution satisfied the following elements:

> First, that two or more persons entered the unlawful agreement that is charged in the [superseding] indictment, starting in or about the spring of 2008, and this is the agreement to commit extortion under color of official right[;]
>
> Second, that the defendant, Mr. Ocasio, knowingly and willfully became a member of that conspiracy[;]
>
> Third, that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the [superseding] indictment; and
>
> [F]ourth, that the overt act, which you find to have been committed, was done to further some objective of the conspiracy.

19

J.A. 1176-77. The court explained that "the reasonably foreseeable acts, declarations, statements and omissions of any member of [a] conspiracy, in furtherance of the common purpose of the conspiracy, are considered under the law to be the acts of all the members, and all the members are responsible for such acts." Id. at 1186. The court further explained that, if the jury found Ocasio a member of the charged conspiracy "then any acts . . . or statements . . . in furtherance of the conspiracy by [persons] you also find to have been members of the conspiracy, may be considered against" Ocasio, "even if those acts were done, and the statements were made, in his absence and without his knowledge." Id.[11]

The statutory object of the Count One conspiracy was to violate the Hobbs Act, which provides, in pertinent part, that

> [w]hoever in any way or degree obstructs, delays, or affects commerce . . . by . . . extortion . . . in furtherance of a plan or purpose to do anything in violation of this section shall be [guilty of an offense against the United States].

---

[11] Of note, the district court made clear that the jury was to consider whether the prosecution had satisfied its burden of proof as to any and all of the overt acts charged in the superseding indictment, including those committed by Manrich. The court explained that, if the jury were to find that both Manrich and Ocasio were members of the conspiracy, then the jury could consider any acts done or statements made by Manrich "during the course of the conspiracy, and in furtherance of the conspiracy," in its "decision as to whether the government has proved all of the elements of the offenses charged against Mr. Ocasio." J.A. 1187-88.

20

18 U.S.C. § 1951(a).  The Hobbs Act defines "extortion," in pertinent part, as "the obtaining of property from another, with his consent, . . . under color of official right."  Id. § 1951(b)(2).  In order to prove such a Hobbs Act extortion offense, the prosecution "need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  Evans v. United States, 504 U.S. 255, 268 (1992).

2.

Ocasio, relying on the Sixth Circuit's decision in United States v. Brock, 501 F.3d 762 (6th Cir. 2007), contends that his conspiracy conviction is fatally flawed because a public official cannot be convicted of conspiring to extort property from his own coconspirator.  He seeks to distinguish our decision in United States v. Spitler, 800 F.2d 1267 (4th Cir. 1985) — the decision primarily relied upon by the district court to reject Ocasio's theory.

a.

We begin our analysis by discussing Brock and Spitler.[12]  In the latter case, we ruled that Spitler, an employee of a state

---

[12] In Brock and Spitler, the defendants were not prosecuted under 18 U.S.C. § 371, the statute specified in Count One, but under the conspiracy provision of the Hobbs Act, 18 U.S.C. § 1951.  Although the elements of those offenses are similar, a § 371 conspiracy requires proof of an overt act, while a § 1951
(Continued)

contractor, was properly convicted under the Hobbs Act for conspiring with a state highway official to extort money and property from Spitler's employer. See 800 F.2d at 1278-79. Spitler authorized his underlings to accede to the public official's demands for firearms, jewelry, and other items of value in exchange for approval of inflated invoices. Spitler posited on appeal that "as a victim of [the public official's] extortion he could not, as a matter of law, be convicted as an aider and abettor or a conspirator to the extortion merely by virtue of his acquiescence." Id. at 1275. We determined, however, that Spitler was no "mere extortion victim." Id.

In so ruling, Spitler recognized the extremes of a spectrum of conduct ranging from "mere acquiescence" (which is not punishable under conspiracy principles) to active solicitation and inducement (which plainly fall within the purview of the conspiracy statutes). See 800 F.2d at 1276-78. Writing for the panel, Judge Russell found it unnecessary to "paint with a broad brush and declare a bright line at which a payor's conduct constitutes sufficient activity beyond the mere acquiescence of a victim so as to subject him to prosecution as an aider and

_____

conspiracy does not. The maximum penalties under the two statutes also differ: A conspiracy conviction under § 1951 carries a maximum of twenty years, four times that of a conspiracy conviction under § 371.

22

abettor or a conspirator." Id. at 1278. That was because the panel concluded that Spitler's involvement in the extortion scheme "constituted a far more active role" than the mere payment of money, in that Spitler had also "induced, procured, caused, and aided" the public official's ongoing extortion. Id. (internal quotation marks omitted).

Thereafter, in its contrary Brock decision, the Sixth Circuit ruled that the Hobbs Act's conspiracy provision did not reach conduct by private citizens who had concocted a bribery scheme to pay off a county clerk. Brock and his brother operated a bail bond business. When a client "skipped town" and the Brocks became liable on the bond, Brock asked the county clerk to "make the problem go away by removing the scheduled forfeiture hearing from the court's calendar." See 501 F.3d at 765 (internal quotation marks and punctuation omitted). Brock then paid the clerk for altering the court's schedule. Brock and his brother conducted the scheme with the county clerk over several years, securing the clerk's cooperation when their bonding clients absconded. The court of appeals determined that, because the Brocks were victims of the clerk's extortion scheme, they could not also be conspirators.

In so ruling, the Brock court focused on the language of the Hobbs Act, reasoning that a Hobbs Act conspiracy requires an agreement to obtain "'property from another,' which is to say,

23

. . . an agreement to obtain property from someone outside the conspiracy." 501 F.3d at 767. Additionally, the court noted that the Hobbs Act "requires the conspirators to obtain that property with the other's consent," and questioned how or why extortion victims would "conspire to obtain their own consent." Id. As the court summarized, "the law says that the conspiracy must extort 'property from another' and do so 'with his consent,' neither of which applies naturally to the conspirators' own property or to their own consent." Id. at 768. Notably, the Brock court acknowledged Spitler but emphasized that it "did not consider the textual anomalies raised here." Id. at 769.

b.

As the district court determined, Ocasio's case is governed by our Spitler precedent. The Spitler rule is that a person like Moreno or Mejia, who actively participates (rather than merely acquiesces) in a conspiratorial extortion scheme, can be named and prosecuted as a coconspirator even though he is also a purported victim of the conspiratorial agreement. That rule comports with basic conspiracy principles: One who knowingly participates in a conspiracy to violate federal law can be held accountable for not only his actions, but also the actions of his coconspirators. See, e.g., United States v. Burgos, 94 F.3d 849, 858 (4th Cir. 1996) (en banc). Put simply, as Judge

24

Haynsworth aptly explained nearly thirty years ago, a conviction for "conspiring to obstruct commerce in violation of the Hobbs Act may be founded upon proof of an agreement to engage in conduct which would violate the statute." United States v. Brantley, 777 F.2d 159, 163 (4th Cir. 1985).

Ocasio contends to the contrary. Relying on Brock, he argues that the Hobbs Act's "from another" language requires that a coconspirator obtain property "from someone outside the conspiracy." 501 F.3d at 767. At the outset, we note that the language of the Hobbs Act does not compel this conclusion: the "from another" requirement refers to a person or entity other than the public official. That is, it provides only that a public official cannot extort himself. Thus, where a defendant is charged with conspiring to commit Hobbs Act extortion, the prosecution must show that the object of the conspiracy was for the conspiring public official to extort property from someone other than himself. Nothing in the Hobbs Act forecloses the possibility that the "another" can also be a coconspirator of the public official.

Ocasio next contends that the law must require that a victim under the Hobbs Act be a person outside the conspiracy because, otherwise, every victim's "consent" could be considered his agreement to enter into a conspiracy with his victimizer, "thereby creating a separately punishable conspiracy in every

25

§ 1951(a) case." See Br. of Appellant 28. Ocasio's premise, however, is foreclosed by Spitler, which underscored the proposition that mere acquiescence in an extortion scheme is not conspiratorial conduct. Rather, "conduct more active than mere acquiescence" is necessary before a person "may depart the realm of a victim and may unquestionably be subject to conviction for aiding and abetting and conspiracy." Spitler, 800 F.2d at 1276. Under Spitler, therefore, Ocasio is wrong to suggest that every extortion scheme will necessarily involve a conspiracy to commit extortion. A bribe-payor's mere acquiescence to the scheme suffices to render a bribe-taker guilty of extortion. But Spitler requires the bribe-payor's more active participation in the scheme to make him a coconspirator.[13]

---

[13] The Brock court attempted to distinguish Spitler on the ground that the conspirators in Spitler, unlike those in Brock, did in fact obtain property from "'another' unrelated entity outside the conspiracy." See Brock, 501 F.3d at 769. Under this theory, Spitler's employer — and not Spitler himself — was the victim of the public official and Spitler's extortion scheme. The Brock court distinguished the case before it by describing the alleged conspiracy as one whose "supposed point . . . was to extort the Brocks' cash payments, . . . not property from an unrelated entity outside the conspiracy." Id.

In Spitler, however, we criticized the government for arguing that Spitler could be convicted as a conspirator because it was his employer who was the extortion victim. Specifically, we "question[ed] the soundness of the government's position because under its theory, a corporate officer who merely accedes to a public official's implicit or explicit demands to the corporation by authorizing an expenditure of corporate funds would be subject to prosecution under the Hobbs Act for aiding (Continued)

In light of our precedent, we must affirm Ocasio's Count One conspiracy conviction. See Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) ("Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." (internal quotation marks omitted)). We thus decline Ocasio's invitation to afford him relief under the rule of lenity. See Chapman v. United States, 500 U.S. 453, 463 (1991) ("The rule of lenity . . . is not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the Act, such that even after a court has seized every thing from which aid can be derived, it is still left with an ambiguous statute." (internal quotation marks omitted)). We also refuse, as we must, to abandon our Spitler precedent and adopt the Sixth Circuit's analysis in Brock. See McMellon v. United States, 387 F.3d 329, 332 (4th Cir. 2004) (en banc) (recognizing "the basic principle that one panel cannot overrule a decision issued by another panel").[14]

---

and abetting the extortion and for conspiracy to commit the extortion." Spitler, 800 F.2d at 1275. The propriety of Spitler's conspiracy conviction, Judge Russell explained, rested not on whether some other victim could be identified, but on whether Spitler was a mere victim of — rather than an active participant in — the extortion scheme.

[14] We further observe that Ocasio's Brock theory is factually flawed, in that it relies on an evidentiary premise — that his only coconspirators were Moreno and Mejia — that is (Continued)

27

B.

Although we affirm Ocasio's convictions, we vacate the sentencing court's award of restitution to Erie Insurance. Ocasio maintains that Erie was not a victim of any of his offenses of conviction. At best, he contends, Erie was the victim of an uncharged insurance fraud scheme. Our review of the court's restitution order is for abuse of discretion. See United States v. Llamas, 599 F.3d 381, 387 (4th Cir. 2010). We assess de novo any legal questions raised with respect to restitution issues, including matters of statutory interpretation. See United States v. Ryan-Webster, 353 F.3d 353, 359 (4th Cir. 2003).

The Victim Witness Protection Act (the "VWPA") provides in pertinent part that a district court, when sentencing a defendant convicted under Title 18, may order him to make restitution to any victim of the offenses of conviction. See 18 U.S.C. § 3663. The VWPA defines a "victim" as

> a person directly and proximately harmed as a result of the commission of an offense for which restitution

entirely at odds with the record. To the contrary, the evidence established a wide-ranging conspiracy involving dozens of BPD officers who received money for referring wrecked vehicles to the Majestic Repair Shop. Under the evidence, the jury was entitled to find each of those BPD officers to be Ocasio's coconspirator, regardless of whether Ocasio even knew him. See Burgos, 94 F.3d at 858.

28

> may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

Id. § 3663(a)(2). The Supreme Court has explained that a restitution award must "be tied to the loss caused by the offense of conviction" and does not "permit a victim to recover for losses stemming from all conduct attributable to the defendant." Hughey v. United States, 495 U.S. 411, 418 (1990). Consistent therewith, we have recognized that the VWPA "authorizes restitution only for losses traceable to the offense of conviction." United States v. Ubakanma, 215 F.3d 421, 428 (4th Cir. 2000). In conspiracy prosecutions, however, "broader restitution orders encompassing losses that result from a criminal scheme or conspiracy, regardless of whether the defendant is convicted for each criminal act within that scheme," are permitted. United States v. Henoud, 81 F.3d 484, 488 (4th Cir. 1996). Nevertheless, an award of restitution is only appropriate if the act that harms the purported victim is "either conduct underlying an element of the offense of conviction, or an act taken in furtherance of a scheme, conspiracy, or pattern of criminal activity that is specifically included as an element of the offense of conviction." United States v. Blake, 81 F.3d 498, 506 (4th Cir. 1996). Accordingly, we explained that when

29

> the harm to the person [or entity] does not result from conduct underlying an element of the offense of conviction, or conduct that is part of a pattern of criminal activity that is an element of the offense of conviction, the district court may not order the defendant to pay restitution to that individual.

Id.

Applying the foregoing standard to these circumstances, we are unable to endorse the sentencing court's determination that Erie Insurance suffered any losses that resulted from the Hobbs Act extortion conspiracy charged in Count One. Indeed, nothing in the superseding indictment or in the trial evidence suggests that an object of that conspiracy was to commit insurance fraud. Nor does the record suggest that an insurance fraud scheme was part of a pattern of criminal activity included as an element of the Count One conspiracy. Perhaps Ocasio could also have been convicted of defrauding Erie Insurance or conspiring to do so, but that did not occur. The United States Attorney and the grand jury did not see fit to charge Ocasio with an insurance fraud scheme, and it would thus be inappropriate to penalize him as though he was also convicted of that offense. Because Erie was not a "victim" under the VWPA, the district court's award of restitution to Erie Insurance must be vacated.[15]

---

[15] The information under which Moreno and Mejia were separately prosecuted and convicted alleged, in pertinent part, that (1) "Moreno and Mejia agreed with various BPD Officers to add damage to vehicles in order to increase Majestic's profit (Continued)

30

III.

Pursuant to the foregoing, Ocasio's convictions and sentence, as reflected in the district court's judgment order of June 6, 2012, are affirmed. The court's amended judgment order of July 23, 2012, however, is vacated to the extent that it includes the award of restitution to Erie Insurance. We remand for such other and further proceedings as may be appropriate.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

---

from the insurance company payments," and (2) "various BPD Officers would falsify [accident reports]" to make it appear that the damage added to the vehicle by Majestic had actually been caused by the underlying accident, thus enabling Majestic to seek additional reimbursements from various insurance companies. See United States v. Moreno, No. 1:11-cr-357, Information at 5 (D. Md. June 29, 2011), ECF No. 1. Notably, however, neither the initial nor the superseding indictments charging Ocasio include any allegation that he or any other conspirator falsified accident reports or insurance claims.

31