Justice ALITO delivered the opinion of the Court.
Petitioner Samuel Ocasio, a former officer in the Baltimore Police Department, participated in a kickback scheme with the owners of a local auto repair shop. When petitioner and other Baltimore officers reported to the scene of an auto accident, they persuaded the owners of damaged cars to have their vehicles towed to the repair shop, and in exchange for this service the officers received payments from the shopowners. Petitioner was convicted of obtaining money from the shopowners under color of official right, in violation of the Hobbs Act, 18 U.S.C. § 1951, and of conspiring to violate the Hobbs Act, in violation of 18 U.S.C. § 371. He now challenges his conspiracy conviction, contending that, as a matter of law, he cannot be convicted of conspiring with the shopowners to obtain money from them under color of official right. We reject this argument because it is contrary to age-old principles of conspiracy law.
I
Hernan Alexis Moreno Mejia (known as Moreno) and Edwin Javier Mejia (known as Mejia) are brothers who co-owned and operated the Majestic Auto Repair Shop (Majestic). In 2008, Majestic was struggling to attract customers, so Moreno and Mejia made a deal with a Baltimore police officer, Jhonn Corona. In exchange for kickbacks, Officer Corona would refer motorists whose cars were damaged in accidents to Majestic for towing and repairs. Officer Corona then spread the word to other members of the force, and eventually as many as 60 other officers sent damaged cars to Majestic in exchange for payments of $150 to $300 per referral.
Petitioner began to participate in this scheme in 2009. On several occasions from 2009 to 2011, he convinced accident victims to have their cars towed to Majestic. Often, before sending a car to Majestic, petitioner called Moreno from the scene of an accident to ensure that the make and model of the car, the extent of the damage, and the car's insurance coverage would allow the shopowners to turn a profit on the repairs. After directing a vehicle to Majestic, petitioner would call Moreno and request his payment.
*1428 Because police are often among the first to arrive at the scene of an accident, the Baltimore officers were well positioned to route damaged vehicles to Majestic. As a result, the kickback scheme was highly successful: It substantially increased Majestic's volume of business and profits, and by early 2011 it provided Majestic with at least 90% of its customers.
Moreno, Mejia, petitioner, and nine other Baltimore officers were indicted in 2011. The shopowners and most of the other officers eventually pleaded guilty pursuant to plea deals, but petitioner did not.
In a superseding indictment, petitioner was charged with three counts of violating the Hobbs Act, 18 U.S.C. § 1951, by extorting money from Moreno with his consent and under color of official right. As all parties agree, the type of extortion for which petitioner was convicted-obtaining property from another with his consent and under color of official right-is the "rough equivalent of what we would now describe as 'taking a bribe.' " Evans v. United States, 504 U.S. 255, 260, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992). To prove this offense, the Government "need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Id., at 268, 112 S.Ct. 1881.
Petitioner and another Baltimore officer, Kelvin Quade Manrich, were also charged with violating the general federal conspiracy statute, 18 U.S.C. § 371. The indictment alleged that petitioner and Manrich conspired with Moreno, Mejia, and other Baltimore officers to bring about the same sort of substantive violations with which petitioner was charged.
Before trial, petitioner began to raise a variant of the legal argument that has brought his case to this Court. He sought a jury instruction stating that "[i]n order to convict a defendant of conspiracy to commit extortion under color of official right, the government must prove beyond a reasonable doubt that the conspiracy was to obtain money or property from some person who was not a member of the conspiracy." App. 53. In support of this instruction, petitioner relied on the Sixth Circuit's decision in United States v. Brock, 501 F.3d 762 (2007), which concerned two bail bondsmen who made payments to a court clerk in exchange for the alteration of court records. The Sixth Circuit held that "[t]o be covered by the [Hobbs Act], the alleged conspirators ... must have formed an agreement to obtain 'property from another, ' which is to say, formed an agreement to obtain property from someone outside the conspiracy." Id., at 767. The District Court did not rule on this request prior to trial.
Petitioner's codefendant, Manrich, pleaded guilty during the trial, and at the close of the prosecution's case and again at the close of all evidence, petitioner moved for a judgment of acquittal on the conspiracy count based on Brock . The District Court denied these motions, concluding that the Fourth Circuit had already rejected Brock 's holding in United States v. Spitler, 800 F.2d 1267 (1986).
The District Court also refused to give petitioner's proposed instruction. Instead, the court adopted the sort of standard instructions that are typically used in conspiracy cases. See generally L. Sand et al., Modern Federal Jury Instructions: Criminal § 19.01 (2015). In order to convict petitioner of the conspiracy charge, the jury was told, the prosecution was required to prove (1) that two or more persons entered into an unlawful agreement; (2) that petitioner knowingly and willfully became a member of the conspiracy; (3) that at least one member of the *1429 conspiracy knowingly committed at least one overt act; and (4) that the overt act was committed to further an objective of the conspiracy. The court "caution[ed]" "that mere knowledge or acquiescence, without participation in the unlawful plan, is not sufficient" to demonstrate membership in the conspiracy. App. 195. Rather, the court explained, the conspirators must have had "a mutual understanding ... to cooperate with each other to accomplish an unlawful act," and petitioner must have joined the conspiracy "with the intention of aiding in the accomplishment of those unlawful ends." Id., at 192, 195.
The jury found petitioner guilty on both the conspiracy count and the three substantive extortion counts, and the District Court sentenced him to concurrent terms of 18 months in prison on all four counts. On appeal to the Fourth Circuit, petitioner's primary argument was the same one he had pressed before the District Court: that his conspiracy conviction was fatally flawed because the conspirators had not agreed to obtain money from a person who was not a member of the conspiracy. The Fourth Circuit rejected petitioner's argument and affirmed his convictions. 750 F.3d 399 (2014).
We then granted certiorari, 574 U.S. ----, 135 S.Ct. 1491, 191 L.Ed.2d 430 (2015), and we now affirm.
II
Under longstanding principles of conspiracy law, a defendant may be convicted of conspiring to violate the Hobbs Act based on proof that he entered into a conspiracy that had as its objective the obtaining of property from another conspirator with his consent and under color of official right.
A
In analyzing petitioner's arguments, we begin with the text of the statute under which he was convicted, namely, the general federal conspiracy statute, which makes it a crime to "conspire ... to commit any offense against the United States." 18 U.S.C. § 371 (emphasis added). Section 371's use of the term "conspire" incorporates long-recognized principles of conspiracy law. And under established case law, the fundamental characteristic of a conspiracy is a joint commitment to an "endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense." Salinas v. United States, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) ; see 2 J. Bishop, Commentaries on the Criminal Law § 175, p. 100 (rev. 7th ed. 1882) ("Conspiracy, in the modern law, is generally defined as a confederacy of two or more persons to accomplish some unlawful purpose"); J. Hawley & M. McGregor, The Criminal Law 99-100 (3d ed. 1899) (similar); W. LaFave, Criminal Law 672 (5th ed. 2010) (similar).
Although conspirators must "pursue the same criminal objective," "a conspirator [need] not agree to commit or facilitate each and every part of the substantive offense." Salinas, supra, at 63, 118 S.Ct. 469. A defendant must merely reach an agreement with the "specific intent that the underlying crime be committed " by some member of the conspiracy. 2 K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions: Criminal § 31:03, p. 225 (6th ed. 2008) (emphasis added); see also id., § 31:02, at 220 (explaining that a defendant must "intend to agree and must intend that the substantive offense be committed " (emphasis added)). "The government does not have to prove that the defendant intended to commit the underlying offense himself/herself." Id., § 31:03, at 226. Instead, "[i]f *1430 conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." Salinas, supra, at 64, 118 S.Ct. 469 ; see Sand, supra, § 19.01, at 19-54 ("[W]hen people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy").
A few simple examples illustrate this important point. Entering a dwelling is historically an element of burglary, see, e.g., LaFave, supra, at 1069, but a person may conspire to commit burglary without agreeing to set foot inside the targeted home. It is enough if the conspirator agrees to help the person who will actually enter the dwelling, perhaps by serving as a lookout or driving the getaway car. Likewise, "[a] specific intent to distribute drugs oneself is not required to secure a conviction for participating in a drug-trafficking conspiracy." United States v. Piper, 35 F.3d 611, 614 (C.A.1 1994). Agreeing to store drugs at one's house in support of the conspiracy may be sufficient. Ibid.
Not only is it unnecessary for each member of a conspiracy to agree to commit each element of the substantive offense, but also a conspirator may be convicted "even though he was incapable of committing the substantive offense" himself. Salinas, supra, at 64, 118 S.Ct. 469 ; see United States v. Rabinowich, 238 U.S. 78, 86, 35 S.Ct. 682, 59 L.Ed. 1211 (1915) ("A person may be guilty of conspiring although incapable of committing the objective offense"); Sand, supra, § 19.01, at 19-3 ("[Y]ou may find the defendant guilty of conspiracy despite the fact that he himself was incapable of committing the substantive crime").
The Court applied these principles in two cases involving the Mann Act. See Act of June 25, 1910, ch. 395, 36 Stat. 825. Section 2 of the Mann Act made it a crime to transport a woman or cause her to be transported across state lines for an immoral purpose.[1] In United States v. Holte, 236 U.S. 140, 35 S.Ct. 271, 59 L.Ed. 504 (1915), a federal grand jury charged a woman, Clara Holte, with conspiring with a man named Chester Laudenschleger to violate this provision. The District Court dismissed the charge against Holte, holding that because a woman such as Holte could not be convicted for the substantive offense of transporting herself or causing *1431 herself to be transported across state lines, she also could not be convicted of conspiring to commit that offense.
In a succinct opinion by Justice Holmes, the Court rejected this argument, stating that "plainly a person may conspire for the commission of a crime by a third person," even if "she could not commit the substantive crime" herself. Id., at 144-145, 35 S.Ct. 271.[2] The dissent argued that this holding effectively turned every woman who acquiesced in a covered interstate trip into a conspirator, see id., at 148, 35 S.Ct. 271 (opinion of Lamar, J.), but the Court disagreed. The Court acknowledged that "there may be a degree of cooperation" insufficient to make a woman a conspirator, but it refused to rule out the possibility that a woman could conspire to cause herself to be transported. Id., at 144, 35 S.Ct. 271. To illustrate this point, the Court provided the example of a woman who played an active role in planning and carrying out the trip.[3]
The Court expanded on these points in Gebardi v. United States, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932), another Mann Act conspiracy case. A man and a woman were convicted for conspiring to transport the woman from one state to another for an immoral purpose. Id., at 115-116, 53 S.Ct. 35. In deciding the case, the Gebardi Court explicitly reaffirmed the longstanding principle that "[i]ncapacity of one to commit the substantive offense does not necessarily imply that he may with impunity conspire with others who are able to commit it." Id., at 120, 53 S.Ct. 35. Moreover, the Court fully accepted Holte 's holding that a woman could be convicted of conspiring to cause herself to be transported across state lines. See 287 U.S., at 116-117, 53 S.Ct. 35. But the Court held that the evidence before it was insufficient to support the conspiracy convictions because it "show[ed] no more than that [the woman] went willingly upon the journeys for the purposes alleged." Id., at 117, 53 S.Ct. 35. Noting that there was no evidence that the woman was "the active or moving spirit in conceiving or carrying out the transportation," the Court held that the evidence of her "mere consent" or "acquiescence" was not enough. Id ., at 117, 123, 53 S.Ct. 35.[4]
*1432 Holte and Gebardi make perfectly clear that a person may be convicted of conspiring to commit a substantive offense that he or she cannot personally commit. They also show that when that person's consent or acquiescence is inherent in the underlying substantive offense, something more than bare consent or acquiescence may be needed to prove that the person was a conspirator.
B
These basic principles of conspiracy law resolve this case. In order to establish the existence of a conspiracy to violate the Hobbs Act, the Government has no obligation to demonstrate that each conspirator agreed personally to commit-or was even capable of committing-the substantive offense of Hobbs Act extortion. It is sufficient to prove that the conspirators agreed that the underlying crime be committed by a member of the conspiracy who was capable of committing it. In other words, each conspirator must have specifically intended that some conspirator commit each element of the substantive offense.[5]
That is exactly what happened here: Petitioner, Moreno, and Mejia "share[d] a common purpose," namely, that petitioner and other police officers would commit every element of the substantive extortion offense. Salinas, 522 U.S., at 63-64, 118 S.Ct. 469. Petitioner and other officers would obtain property "under color of official right," something that Moreno and Mejia were incapable of doing because they were not public officials. And petitioner and other officers would obtain that money from "another," i.e., from Moreno, Mejia, or Majestic. Although Moreno and Mejia were incapable of committing the underlying substantive offense as principals,[6] they could, under the reasoning of Holte and Gebardi, conspire to commit Hobbs Act extortion by agreeing to help petitioner and other officers commit the substantive offense. See Holte, 236 U.S., at 145, 35 S.Ct. 271 ("[A] conspiracy with an officer or employé of the government or any other for an offence that only he could commit has been *1433 held for many years to fall within the conspiracy section ... of the penal code"); see also Salinas, supra, at 63-64, 118 S.Ct. 469 ; Gebardi, supra, at 120-121, 53 S.Ct. 35 ; Rabinowich, 238 U.S., at 86, 35 S.Ct. 682. For these reasons, it is clear that petitioner could be convicted of conspiring to obtain property from the shopowners with their consent and under color of official right.
C
In an effort to escape this conclusion, petitioner argues that the usual rules do not apply to the type of Hobbs Act conspiracy charged in this case. His basic argument, as ultimately clarified,[7] is as follows. All members of a conspiracy must share the same criminal objective. The objective of the conspiracy charged in this case was to obtain money "from another, with his consent ... under color of official right." But Moreno and Mejia did not have the objective of obtaining money "from another" because the money in question was their own. Accordingly, they were incapable of being members of the conspiracy charged in this case. And since *1434 there is insufficient evidence in the record to show that petitioner conspired with anyone other than Moreno and Mejia, he must be acquitted. See Reply Brief 3-11, 17-20.
This argument fails for a very simple reason: Contrary to petitioner's claim, he and the shopowners did have a common criminal objective. The objective was not that each conspirator, including Moreno and Mejia, would obtain money from "another" but rather that petitioner and other Baltimore officers would do so. See App. 36-37, Superseding Indictment ¶ 11 ("It was a purpose of the conspiracy for Moreno and Mejia to enrich over 50 BPD [Baltimore Police Department] Officers ... in exchange for the BPD Officers' exercise of their official positions and influence to cause vehicles to be towed or otherwise delivered to Majestic"). Petitioner does not dispute that he was properly convicted for three substantive Hobbs Act violations based on proof that he obtained money "from another." The criminal objective on which petitioner, Moreno, and Mejia agreed was that petitioner and other Baltimore officers would commit substantive violations of this nature. Thus, under well-established rules of conspiracy law, petitioner was properly charged with and convicted of conspiring with the shopowners. Nothing in the text of the Hobbs Act even remotely undermines this conclusion, and petitioner's invocation of the rule of lenity[8] and principles of federalism[9] is unavailing.
1
Petitioner argues that our interpretation makes the Hobbs Act sweep too broadly, creating a national antibribery law and displacing a carefully crafted network of state and federal statutes. He contends that a charge of conspiring to obtain money from a conspirator with his consent and under color of official right is tantamount to a charge of soliciting or accepting a bribe and that allowing such a charge undermines 18 U.S.C. § 666 (a federal bribery statute applicable to state and local officials) and state bribery laws. He also argues that extortion conspiracies of this sort were not known prior to the enactment of the Hobbs Act and that there is no evidence that Congress meant for that Act to plow this new ground.
The subtext of these arguments is that it seems unnatural to prosecute bribery on the basis of a statute prohibiting "extortion," but this Court held in Evans that Hobbs Act extortion "under color of official right" includes the "rough equivalent of what we would now describe as 'taking a bribe.' " 504 U.S., at 260, 112 S.Ct. 1881. Petitioner does not ask us to overturn Evans, see, e.g., Brief for Petitioner 1; Tr. of Oral Arg. 4-5, 12-13, and we have no occasion to do so. Having already held that § 1951 prohibits the "rough equivalent" of bribery, we have no principled basis for precluding the prosecution of conspiracies to commit that same offense.[10]
*1435 Petitioner also exaggerates the reach of our decision. It does not, as he claims, dissolve the distinction between extortion and conspiracy to commit extortion. Because every act of extortion under the Hobbs Act requires property to be obtained with "consent," petitioner argues, proof of that consent will always or nearly always establish the existence of a conspiratorial agreement and thus allow the Government to turn virtually every such extortion case into a conspiracy case. But there are plenty of instances in which the "consent" required under the Hobbs Act will not be enough to constitute the sort of agreement needed under the law of conspiracy.
As used in the Hobbs Act, the phrase "with his consent" is designed to distinguish extortion ("obtaining of property from another, with his consent, " 18 U.S.C. § 1951(b)(2) (emphasis added)) from robbery ("obtaining of personal property from the person or in the presence of another, against his will, " § 1951(b)(1) (emphasis added)). Thus, "consent" simply signifies the taking of property under circumstances falling short of robbery, and such "consent" is quite different from the mens rea necessary for a conspiracy.
This conclusion is clear from the language of § 1951 prohibiting the obtaining of property "from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear ." § 1951(b)(2) (emphasis added). This language applies when, for example, a store owner makes periodic protection payments to gang members out of fear that they will otherwise trash the store. While these payments are obtained with the store owner's grudging consent, the store owner, simply by making the demanded payments, does not enter into a conspiratorial agreement with the gang members conducting the shakedown. See Salinas, 522 U.S., at 63-65, 118 S.Ct. 469 (conspirators must pursue "the same criminal objective"); United States v. Bailey, 444 U.S. 394, 405, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) (conspiracy requires "a heightened mental state"); Anderson v. United States, 417 U.S. 211, 223, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) ("the prosecution must show that the offender acted with a specific intent"). Just as mere acquiescence in a Mann Act violation is insufficient to create a conspiracy, see Gebardi, 287 U.S., at 121-123, 53 S.Ct. 35 ; Holte, 236 U.S., at 145, 35 S.Ct. 271 the minimal "consent" required to trigger § 1951 is insufficient to form a conspiratorial agreement. Our interpretation thus does not turn virtually every act of extortion into a conspiracy.
Nor does our reading transform every bribe of a public official into a conspiracy to commit extortion. The "consent" required to pay a bribe does not necessarily create a conspiratorial agreement. In cases where the bribe payor is merely complying with an official demand, the payor lacks the mens rea necessary for a conspiracy. See Salinas, supra, at 63-65, 118 S.Ct. 469 ; Bailey, supra, at 405, 100 S.Ct. 624 ; Anderson, supra, at 223, 94 S.Ct. 2253 ;
*1436 Gebardi, supra, at 121-123, 53 S.Ct. 35. For example, imagine that a health inspector demands a bribe from a restaurant owner, threatening to close down the restaurant if the owner does not pay. If the owner reluctantly pays the bribe in order to keep the business open, the owner has "consented" to the inspector's demand, but this mere acquiescence in the demand does not form a conspiracy.[11]
2
While petitioner exaggerates the impact of our decision, his argument would create serious practical problems. The validity of a charge of Hobbs Act conspiracy would often depend on difficult property-law questions having little to do with criminal culpability. In this case, for example, ownership of the money obtained by petitioner is far from clear. It appears that the funds came from Majestic's account, App. 97-98, 149, and there is evidence that during the period of petitioner's membership in the conspiracy, Majestic was converted from a limited liability company to a regular business corporation, id., at 145; App. in No. 12-4462 (CA4), pp. 655-656, 736. After that transformation, the money obtained by petitioner may have come from corporate funds. A corporation is an entity distinct from its shareholders, and therefore, even under petitioner's interpretation of the applicable law, Moreno and Mejia would have agreed that petitioner would obtain money "from another," not from them.
Suppose that Moreno or Mejia had made the payments by taking money from a personal bank account. Would that dictate a different outcome? Or suppose that Majestic was a partnership and the payments came from a company account. Would that mean that Moreno agreed that officers would obtain money "from another" insofar as they would obtain Mejia's share of the partnership funds and that Mejia similarly agreed that officers would obtain money "from another" insofar as they would obtain the share belonging to Moreno?
Or consider this example. Suppose that the owner and manager of a nightclub reach an agreement with a public official under which the owner will bribe the official to approve the club's liquor license application. Under petitioner's approach, the public official and the club manager may be guilty of conspiring to commit extortion, because they agreed that the official would obtain property "from another"-that is, the owner. But as "the 'another' from whom the property is obtained," Reply Brief 10, the owner could not be prosecuted. There is no apparent reason, however, why the manager but not the owner should be culpable in this situation.
III
A defendant may be convicted of conspiring to violate the Hobbs Act based on proof that he reached an agreement with the owner of the property in question to obtain that property under color of official right. Because petitioner joined such an agreement, his conspiracy conviction must stand.
*1437 The judgment of the United States Court of Appeals for the Fourth Circuit is affirmed.
It is so ordered.

In full, § 2 provided as follows:
"That any person who shall knowingly transport or cause to be transported, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce, or in any Territory or in the District of Columbia, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; or who shall knowingly procure or obtain, or cause to be procured or obtained, or aid or assist in procuring or obtaining, any ticket or tickets, or any form of transportation or evidence of the right thereto, to be used by any woman or girl in interstate or foreign commerce, or in any Territory or the District of Columbia, in going to any place for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent or purpose on the part of such person to induce, entice, or compel her to give herself up to the practice of prostitution, or to give herself up to debauchery, or any other immoral practice, whereby any such woman or girl shall be transported in interstate or foreign commerce, or in any Territory or the District of Columbia, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding five thousand dollars, or by imprisonment of not more than five years, or by both such fine and imprisonment, in the discretion of the court." Act of June 25, 1910, ch. 395, 36 Stat. 825 (emphasis added).

The Court assumed that Holte could not be convicted as a principal for the substantive offense of causing herself to be transported across state lines. But the Court noted that it might be possible for a woman to violate § 2 of the Mann Act in a different way: by "aiding in procuring any form of transportation for" a covered interstate trip. Holte, 236 U.S., at 144, 35 S.Ct. 271 ; see 36 Stat. 825 ("aid or assist in obtaining transportation"). If a woman could commit that substantive § 2 violation, the Court explained, there is no reason why she could not also be convicted of conspiring to commit that offense. See 236 U.S., at 145, 35 S.Ct. 271. The Court, however, refused to hold that this was the only ground on which a woman like Holte could be convicted for conspiring to violate § 2. Id., at 144-145, 35 S.Ct. 271. It thus addressed the broader question of whether it was possible for a woman in Holte's position to commit the offense of conspiring "that Laudenschleger should procure transportation and should cause [Holte] to be transported." Id., at 144, 35 S.Ct. 271.

The Court wrote:
"Suppose, for instance, that a professional prostitute, as well able to look out for herself as was the man, should suggest and carry out a journey within the act of 1910 in the hope of blackmailing the man, and should buy the railroad tickets, or should pay the fare from Jersey City to New York, she would be within the letter of the act of 1910, and we see no reason why the act should not be held to apply." Id., at 145, 35 S.Ct. 271.

The path of reasoning by which the Gebardi Court reached these conclusions was essentially as follows:
First, the Court perceived in § 2 of the Mann Act a congressional judgment that a woman should not be convicted for the offense created by that provision if she did no more than consent to or acquiesce in the interstate trip. Gebardi, 287 U.S., at 123, 53 S.Ct. 35. The Court concluded that the transported woman could never be convicted under the language prohibiting a person from transporting a woman or causing a woman to be transported across state lines for an immoral purpose. See id ., at 118-119, 53 S.Ct. 35 ("The Act does not punish the woman for transporting herself"). And with respect to the statutory language making it a crime to " 'aid or assist' someone else in transporting or in procuring transportation for herself," the Court held that aiding and assisting requires more than mere "consent" or "acquiescence." Id ., at 119, 53 S.Ct. 35 ; see also Rosemond v. United States, 572 U.S. ----, ---- - ----, 134 S.Ct. 1240, 1246-1247, 188 L.Ed.2d 248 (2014) (aiding and abetting requires intent to facilitate commission of offense).
Second, turning to the issue of conspiracy, the Court reasoned that something more than the woman's mere consent or acquiescence was needed to avoid undermining the congressional judgment that it saw in § 2. The Court framed its holding as follows: "[W]e perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an affirmative legislative policy to leave her acquiescence unpunished." Gebardi, supra, at 123, 53 S.Ct. 35 (emphasis added).

Section 371 also requires that one of the conspirators commit an overt act in furtherance of the offense. Petitioner does not dispute that this element was satisfied.

The Government argues that the lower courts have long held that a private person may be guilty of this type of Hobbs Act extortion as an aider and abettor. See Brief for United States 36-37. We have no occasion to reach that question here.

Petitioner's position has evolved over the course of this litigation. As noted, petitioner requested a jury instruction stating that "[i]n order to convict a defendant of conspiracy to commit extortion under color of official right, the government must prove beyond a reasonable doubt that the conspiracy was to obtain money or property from some person who was not a member of the conspiracy." App. 53. Under this instruction, as long as the shopowners were named as conspirators, petitioner could not have been convicted even if there was ample evidence to prove that he conspired with other Baltimore officers to obtain money from the shopowners. (And, indeed, when he first raised his Brock argument, see United States v. Brock, 501 F.3d 762 (C.A.6 2007), another officer, Manrich, was still in the case and was charged with the same conspiracy.)
The petition for a writ of certiorari appears to have been based on this same broad argument. The question presented was phrased as follows: "Does a conspiracy to commit extortion require that the conspirators agree to obtain property from someone outside the conspiracy?" Pet. for Cert. i. And the argument in petitioner's opening brief was similar. See Brief for Petitioner 1 (arguing that "a Hobbs Act conspiracy requires that the conspirators agree among themselves to wrongly obtain property from someone outside the ring of conspiracy").
As the Government's brief pointed out, this argument has strange implications. See Brief for United States 27. Assume that there was sufficient evidence to prove that petitioner conspired with other Baltimore officers to obtain money from Moreno and Mejia. Under petitioner's original, broad argument, this charge would be valid so long as Moreno and Mejia were not named as conspirators, but naming them in the indictment would render the charge invalid. Indictments, however, very often do not attempt to name all the conspirators, and the indictment in this case did not do so. See App. 36 (charging that petitioner and Manrich conspired with, among others, persons unknown). It would be very strange if the decision to name Moreno and Mejia rendered an otherwise valid charge defective. (Of course, petitioner might make the even broader argument that the conspiracy charge would fail if Moreno and Mejia, although not named as conspirators in the indictment, were later listed as conspirators in response to a bill of particulars or if the Government took that position at trial, perhaps by seeking to introduce their out-of-court statements under the co-conspirator exemption from the hearsay rule.)
In response to the Government's argument, petitioner's reply brief claimed that his argument is actually the narrower one that we now consider, i.e., that, as a matter of law, Moreno and Mejia cannot be members of a conspiracy that has as its aim the obtaining of money from them with their consent and under color of official right. See Reply Brief 17-20. The reply brief contends that acceptance of this narrower argument requires his acquittal because there is insufficient evidence to show that he conspired with anyone other than Moreno and Mejia. Ibid. The Court of Appeals, however, concluded otherwise. See 750 F.3d 399, 412, n. 14 (C.A.4 2014). Nevertheless, because that court's decision was based primarily on other grounds, we address petitioner's argument as ultimately refined.

That rule applies only when a criminal statute contains a "grievous ambiguity or uncertainty," and "only if, after seizing everything from which aid can be derived," the Court "can make no more than a guess as to what Congress intended." Muscarello v. United States, 524 U.S. 125, 138-139, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (internal quotation marks omitted).

We are not unmindful of the federalism concerns implicated by this case, but those same concerns were raised-and rejected-in Evans v. United States, 504 U.S. 255, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), see id., at 290, 112 S.Ct. 1881 (THOMAS, J., dissenting) ("The Court's construction of the Hobbs Act is repugnant ... to basic tenets of federalism"), which we accept as controlling here, see Part II-C-1, infra .

Justice THOMAS argues that Evans was wrongly decided, and his position makes sense to the extent that he simply refuses to accept that case. But it founders insofar as it suggests that even if Evans is accepted in relation to substantive Hobbs Act charges, it should not be extended to conspiracy cases. See post, at 1437 (dissenting opinion) ("I would not extend Evans ' errors further"); post, at 1438 ("[The Court's] holding ... needlessly extends Evans ' error to the conspiracy context"); post, at 1439 ("The Court today takes another step away from the common-law understanding of extortion that the Hobbs Act adopted"). It would be very strange if a provision of the criminal code meant one thing with respect to charges of a substantive violation but something very different in cases involving a conspiracy to commit the same offense.

Petitioner also claims that naming Moreno and Mejia as conspirators opened the door for prosecutors to employ the potent party-joinder and evidentiary rules that conspiracy charges make available. See Brief for Petitioner 10-11, 18, 26-27, 37. But the naming of the shopowners had no effect on joinder. The only other defendant named in the superseding indictment, Manrich, could have been joined even if the shopowners had not been named. Nor did naming Moreno and Mejia have any effect on the admissibility of evidence of overt acts committed by the Baltimore officers named as petitioner's co-conspirators.