# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-11001

United States Court of Appeals
Fifth Circuit

**FILED**

July 30, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

NYGUL ANDERSON; ALBERT GONZALEZ,

Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, SMITH, and SOUTHWICK, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Seventeen-year-old Jose Torres, eighteen-year-old Albert Gonzalez, nineteen-year-old Nygul Anderson, and twenty-one-year-old Fernando Cabrera set off from McAllen, Texas to pick up a delivery of what they understood to be "drug money" in Fort Worth. Instead, they drove into an FBI sting operation, part of an investigation into an attempted kidnapping and extortion. Anderson and Gonzalez were convicted for conspiracy to possess the proceeds of extortion, conspiracy to violate the Travel Act, and attempted money laundering. They appeal, arguing the evidence was insufficient to support their convictions, and also challenge their sentences. We AFFIRM Anderson's and Gonzalez's convictions for conspiracy to violate the Travel Act,

No. 18-11001

REVERSE their convictions for attempted money laundering, REVERSE Anderson's conviction for conspiracy to possess extortion proceeds, VACATE their sentences and REMAND for resentencing.

## I.

In September 2017, Raymundo Diaz Martinez of Fort Worth, Texas received a telephone call from Mexico, telling him that his brothers had been kidnapped, and would be murdered unless Raymundo paid a $300,000 ransom, eventually reduced to $20,000. Raymundo, followed the kidnapper's instructions, placed $20,000 next to a dumpster at a 7-Eleven in Fort Worth. Raymundo's brothers were released and returned home. Two days later, the kidnapper again threatened to kidnap and murder Raymundo's brothers if Raymundo did not make a further $100,000 payment, eventually lowering the demand to $20,000. This time, Raymundo contacted the FBI. Setting its trap, the FBI directed Raymundo to continue the contact and agree to pay the kidnapper.

Nine days later, Fernando Cabrera received a WhatsApp voicemail message in McAllen, Texas from a friend named "Pancho," a drug dealer in Monterrey, Mexico. Pancho told Cabrera that he was expecting a delivery of money in Texas and wanted Cabrera to pick it up. Cabrera agreed and discussed with Pancho means of converting the cash to bank deposits or prepaid telephone cards. Pancho agreed to give Cabrera ten percent of the money as a payment for his services. Cabrera's roommate and best friend Albert Gonzalez was lying next to Cabrera in bed during this conversation. Because Pancho and Cabrera were using WhatsApp's voicemail messaging function, Gonzalez heard the conversation. Gonzalez agreed to join Cabrera in the pick up. Cabrera and Gonzalez then discussed the plan. They understood the delivery involved payments for Pancho's drugs.

2

No. 18-11001

Neither Cabrera nor Gonzalez had a car, so they enlisted an acquaintance, Jose Torres, to drive, although he had no car and his mother refused to let him drive hers. Torres then recruited his classmate and friend Nygul Anderson to drive, both understanding that they were to pick up drug money. At some point before or during the drive, Cabrera shared a modification to the plan: he would steal Pancho's money, and pay $1,000 to Torres, $1,500 to Anderson, and $4,000 to Gonzalez, and buy clothes for each of them.

On October 13, 2017, the four young men set off from McAllen towards Houston. During the drive, Pancho informed Cabrera that the money would be dropped off for them in Fort Worth. Later the same day, under instruction from the FBI, Raymundo dropped off a bag at a Home Depot in Fort Worth. Anderson's car with its four occupants arrived in the same Home Depot parking lot, and, while attempting to retrieve the bag, all four occupants were intercepted and arrested by FBI agents.

Anderson and Gonzalez were indicted in counts of conspiracy to possess extortion proceeds, conspiracy to use an interstate facility to commit a Travel Act violation, and attempted money laundering. State prosecutors charged Torres with engaging in organized crime; he agreed with federal prosecutors to testify against Anderson and Gonzalez. Cabrera accepted a guilty plea. The Court conducted a bench trial of Anderson and Gonzalez in February 2018. At the close of the Government's case, both defendants moved for acquittal, arguing the evidence was insufficient to sustain convictions on each of the three counts. The district court deferred ruling on these motions, and at the close of evidence found Anderson and Gonzalez guilty on all counts, sentencing Anderson to 36 months and Gonzalez to 30 months of imprisonment. This appeal followed.

No. 18-11001

## II.

We have jurisdiction over Anderson's and Gonzalez's appeals of final decisions and sentences of the district court.[1] In considering a challenge to the sufficiency of the evidence for a conviction, we ask "whether the finding of guilt is supported by . . . evidence sufficient to justify the trial judge, as the trier of fact, in concluding beyond a reasonable doubt that the defendant is guilty."[2] We "view all evidence in the light most favorable to the government and defer to all reasonable inferences by the trial court," without "weigh[ing] evidence" or "determin[ing] the credibility of witnesses."[3] "A challenge to the sufficiency of the evidence that is procedurally preserved . . . is reviewed de novo."[4]

### A.

The Travel Act prohibits "travel[ing] in interstate or foreign commerce or us[ing] the mail or any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," and then performing or attempting such act.[5] A business enterprise involving narcotics or controlled substances is an "unlawful activity" under the Act.[6] A business enterprise is "a continuous course of conduct, rather than sporadic casual involvement in a proscribed activity."[7] "We do not . . . require the government to prove that the defendant personally engaged in a continuous

---

[1] 28 U.S.C. § 1291; 18 U.S.C. § 3742.

[2] *United States v. Smith*, 895 F.3d 410, 415 (5th Cir. 2018) (internal quotation marks omitted), *cert. denied*, 139 S. Ct. 495 (2018).

[3] *Id.* at 415–16 (internal quotation marks omitted).

[4] *United States v. McElwee*, 646 F.3d 328, 340 (5th Cir. 2011) (quotation marks omitted).

[5] 18 U.S.C. § 1952(a).

[6] *Id.* § 1952(b)(i)(1).

[7] *United States v. Carrion*, 809 F.2d 1120, 1127 (5th Cir. 1987) (quotation marks omitted).

No. 18-11001

course of conduct. Rather, the government must prove only that there was a continuous business enterprise and that the defendant participated in the enterprise."[8] Knowing promotion of one transaction in the broader enterprise is promotion of the enterprise itself.[9] To prove conspiracy, the Government must prove that the defendant was one of two or more persons agreeing to commit the offense, and that a conspirator undertook an act "to effect the object of the conspiracy."[10]

Anderson and Gonzalez concede they agreed to use an interstate facility—namely, Cabrera's cellphone—with the intent of promoting or facilitating what they understood to be Pancho's drug transaction. They argue, however, that, in so doing, the evidence establishes at most their role in "a one-off . . . isolated incident"— activity that was not continuous, and therefore not an unlawful business enterprise under the Act. [11]

We disagree. The Government's evidence established that both Anderson and Gonzalez understood they were driving to the Fort Worth area to pick up "drug money." Gonzalez had overheard Cabrera's original exchange with Pancho—whom he had personally met in Reynosa, Mexico earlier that year. Cabrera was well aware of Pancho's occupation. Cabrera and Gonzalez were best friends, who shared a room, even a bed. It would be reasonable to infer that Gonzalez shared Cabrera's awareness of Pancho's drug enterprise.

---

[8] *United States v. Ruiz*, 987 F.2d 243, 251 (5th Cir. 1993) (citation omitted).

[9] *Carrion*, 809 F.2d at 1127.

[10] 18 U.S.C. § 371.

[11] Appellants argue that Cabrera's WhatsApp messages with Pancho, which indicated a continuous enterprise, were inadmissible hearsay, and that in the absence of this evidence, the Government would have been unable to prove their knowledge of a broader criminal enterprise. But Appellants concede that messages exchanged by co-conspirators in furtherance of a conspiracy were admissible. Both defendants were part of a drug-trafficking conspiracy; Cabrera's messages coordinated their participation in this conspiracy. To the extent there were other messages concerning other matters, appellants have not established the district court's reliance on those messages.

No. 18-11001

Anderson's connection to Cabrera and Gonzalez ran through his friend and classmate Jose Torres. Torres knew Cabrera, and understood that Cabrera was "bad," with a lot of money and "into . . . drugs." When Cabrera offered Torres $1,000 to drive him to Fort Worth, and Torres could not use his car, Torres enlisted Anderson, telling him about Cabrera's offer. Anderson and Torres then both met with Cabrera to discuss the drive. Anderson agreed to drive after he confirmed with Cabrera that they would not be transporting guns or drugs. Cabrera told them they were driving to pick up money from his "uncle[]."

During the drive, occupants of the car could follow Cabrera's conversations with a caller from "MTY"—which Torres understood to be Monterrey, Mexico. At one point Torres overheard a three-way call in which Cabrera and two interlocutors discussed the money drop. One of Cabrera's interlocutors texted Cabrera a photo of the money, which Cabrera showed to his fellow travelers: Torres testified that it was "[m]ore money than [he] had ever seen in [his] life." As they approached Fort Worth, Cabrera—informed by interlocutors on the phone—instructed his companions to go to a Home Depot parking lot to receive the money. There Cabrera and Gonzalez left the car to look through bushes for police or other suspicious circumstances. Torres testified that, based on the circumstances, he surmised they were picking up "drug money." It would be reasonable to infer that Anderson reached a similar conclusion. It also would be reasonable to infer that Anderson understood he was involved in one leg of a drug transaction, one within a broader drug-trafficking enterprise involving a large quantity of money and a network of criminal actors, including persons in Mexico. The evidence was sufficient to support Anderson's and Gonzalez's convictions for conspiracy to violate the Travel Act.

6

No. 18-11001

## B.

Under 18 U.S.C. § 1956, it is unlawful to conduct or attempt to conduct a financial transaction "knowing that the property involved in [the] financial transaction represents the proceeds of some form of unlawful activity" with the "intent to promote the carrying on of specified unlawful activity; or . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."[12] A "transaction" includes "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition."[13] A financial transaction is a transaction that affects interstate or foreign commerce involving the movement of funds or monetary instruments.[14] Drug trafficking is a specified unlawful activity under the statute.[15] Accordingly, courts have interpreted the statute to require a financial transaction that follows the underlying criminal activity that generates the proceeds.[16] That is, the statute requires that the laundering transaction be distinct from the criminal conduct generating the proceeds to-be-laundered—if it were otherwise, any criminal activity involving an exchange of money would double as a laundering offense.[17] "To be guilty of an attempt, the defendant (1) must have been acting with the . . . culpability otherwise required for the commission of the crime

---

[12] 18 U.S.C. § 1956.

[13] *Id.* § 1956(c)(3).

[14] *Id.* § 1956(c)(4)(A).

[15] *Id.* § 1956(c)(7)(B)(i)–(ii).

[16] *United States v. Gaytan*, 74 F.3d 545, 555–56 (5th Cir. 1996); *United States v. Harris*, 666 F.3d 905, 910 (5th Cir. 2012) ("The crime of money laundering is targeted at the activities that generally follow the unlawful activity in time."); *United States v. Johnson*, 971 F.2d 562, 569 (10th Cir. 1992).

[17] *See, e.g., Harris*, 666 F.3d at 909 ("[M]ere payment of the purchase price for drugs by whatever means (even by a financial transaction as defined in § 1956) does not constitute money laundering.").

7

which he is charged with attempting, and (2) must have engaged in conduct which constitutes a substantial step toward commission of the crime."[18]

Anderson and Gonzalez argue that the evidence was insufficient to establish the actus reus required for attempted money laundering: an attempted financial transaction with the proceeds of criminal activity. The Government offers multiple theories of the actus reus.[19] None are viable. At trial the Government urged that the actus reus occurred when Anderson and Gonzalez arrived at the Fort Worth Home Depot and attempted to retrieve Raymundo's bag of money:

> [W]hen they picked up the money from Raymundo, Raymundo was transferring the money from Raymundo to them, to the four conspirators. That is a transfer. . . . We have charged it as attempted money laundering, so that transfer doesn't actually have to take place, it just . . . had to be their attempt, and so in this case . . . there was an attempt to transfer money from the victim, Raymundo Martinez, to these four conspirators.

This theory is short an element of the offense of attempted money laundering. The attempted pick up in the Home Depot parking lot was part of an attempted drug-trafficking transaction, criminal conduct that would have generated proceeds, which the defendants then planned to launder in a distinct later transaction. In fact, the monies Anderson and Gonzalez attempted to transfer in the Home Depot parking lot were not yet "proceeds" because the pick up was

---

[18] *United States v. Salazar*, 958 F.2d 1285, 1293 (5th Cir. 1992) (internal quotation marks omitted).

[19] The actus reus is the guilty act, a violation if done with mens rea, the guilty mind.

interrupted by the FBI's arrests—under our caselaw money does not become proceeds until the underlying criminal transaction is complete.[20]

The alternative theories of the actus reus fail for similar reasons. Rather than accepting the government's trial theory, the district court instead found that Anderson and Gonzalez attempted the necessary financial transaction when they planned to purchase clothes and other items with the retrieved money:

> The Government presented evidence and witness testimony to show that Cabrera and Defendants intended to complete a financial transaction with the extortion proceeds by shopping for clothing, a car, and other purchases.

The problem with this theory is that Anderson's and Gonzalez's actions were interrupted by their arrests: as they never laid hands on the promised delivery of money, the planned purchases remained just that—plans. Their conduct stopped at the attempted drug trafficking and never advanced far enough for them to effect any part of the follow-on laundering transaction that they planned.

On appeal the Government offers us a third theory of the actus reus, urging that we "affirm on the basis of the original plan: the plan to launder the retrieved money through [the] cell phone store." This theory fails for the same reason. The Government argues it is reasonable to infer that Anderson and Gonzalez joined Cabrera's initial plans to launder the money using prepaid phone cards. Perhaps, but the Government cannot point to a substantial step in this transaction. At oral argument, Government counsel offered Anderson

---

[20] *Gaytan*, 74 F.3d at 555–56 (distinguishing "a transaction to pay for illegal drugs"—involving third parties retrieving the drug money—from a laundering transaction, "because the funds involved are not proceeds of an unlawful activity when the transaction occurs, but become so only after the transaction is completed"); *Harris*, 666 F.3d at 910 ("Money does not become proceeds of illegal activity until the unlawful activity is complete.").

and Gonzalez's decision to drive to the agreed-upon pickup location as the necessary substantial step. But by the time they were driving, the four companions had already abandoned the phone-card plan and resolved to steal Pancho's money. The evidence does not establish that either Gonzalez or Anderson took any substantial step towards a laundering transaction involving phone cards. As with the defendants' shopping spree, the phone-card transaction was a mere plan. The statute does not criminalize planning, it criminalizes an attempt—which requires a substantial step. The evidence was insufficient to support Anderson's and Gonzalez's convictions for attempted money laundering.

## C.

"A person who receives, possesses, conceals, or disposes of any money or other property which was obtained from" extortion "knowing the same to have been unlawfully obtained, shall be imprisoned not more than 3 years, fined under this title, or both."[21] A defendant can be convicted of conspiracy, where he was one of two or more persons conspiring to commit an offense against the United States, and a conspirator undertook an act "to effect the object of the conspiracy."[22]

Anderson challenged his conviction for conspiracy to possess extortion proceeds, arguing the evidence was insufficient to establish that he or any of his co-conspirators had specific intent to possess money derived from extortion. To support the conviction, the Government relies on Section 880's language, which states that the requisite mens rea for possession of extortion proceeds is only knowledge that the monies were unlawfully obtained, not that they resulted from extortion. The Government argues it was required only to prove

---

[21] 18 U.S.C. § 880.
[22] *Id.* § 371.

the mens rea required for conviction of the underlying crime (possession of extortion proceeds). The district court accepted the Government's position.

The Government correctly states the mens rea for the underlying offense of possession of extortion proceeds. But Anderson was convicted of conspiracy to commit this offense. The mens rea for conspiracy is distinct and more demanding. To be guilty of conspiracy, "[a] defendant must . . . reach an agreement with the specific intent that the underlying crime be committed by some member of the conspiracy."[23] Here, that would require proof of Anderson's specific intent that at least one of his co-conspirators possess extortion proceeds and do so with the knowledge that the money was unlawfully obtained. The evidence cannot support this mens rea. Trial testimony established that Anderson agreed to retrieve and possess what he thought were the proceeds of drug trafficking. This is also what the district court found. Anderson had no knowledge that extortion was afoot. The evidence fails to support the requisite mens rea and therefore Anderson's conviction for conspiracy to possess extortion proceeds.

## III.

We AFFIRM Anderson's and Gonzalez's convictions for conspiracy to violate the Travel Act, REVERSE their convictions for attempted money laundering, REVERSE Anderson's conviction for conspiracy to possess extortion proceeds, VACATE Anderson's and Gonzalez's sentences, and REMAND for resentencing.

---

[23] *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016) (quotation marks and emphasis omitted); *United States v. Chapman*, 851 F.3d 363, 378 (5th Cir. 2017) ("To be liable as a co-conspirator, an individual must enter the agreement with the 'specific intent that the underlying crime be committed.'" (quoting *Ocasio*, 136 S. Ct. at 1429)).